DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas after a jury found defendant-appellant, Ernest O. Smith, guilty of aggravated murder with a firearm specification and aggravated robbery with a firearm specification. Appellant challenges that judgment through the following assignments of error: *Page 2 
 {¶ 2} "I. The trial court erred in not granting Smith's motion to suppress the statements he made on February 5 and February 7, 2005 while in police custody.
 {¶ 3} "II. Smith received ineffective assistance of counsel.
 {¶ 4} "III. The trial court abused its discretion by giving the jury a flight instruction.
 {¶ 5} "IV. Plain error occurred when Smith's confession was admitted due to the absence of independent evidence.
 {¶ 6} "V. The trial court abused its discretion through several of its evidentiary rulings, and these decisions impacted Smith's ability to have a fair trial.
 {¶ 7} "VI. The trial court erred by not granting Smith's Rule 29 motion for judgment of acquittal because there was insufficient evidence to prove that Smith was criminally liable.
 {¶ 8} "VII. The verdict was against the manifest weight of the evidence.
 {¶ 9} "VIII. The trial court abused its discretion by not granting Smith's motion for a new trial, or alternatively, by not granting a brief continuance to allow both parties an opportunity to fully investigate and argue the merits to the trial court."
 {¶ 10} On February 11, 2005, appellant was indicted and charged with aggravated murder with a firearm specification and aggravated robbery with a firearm specification. The indictment resulted from actions allegedly taken by appellant, Cathy Barnett and Dennis J. Smith in the early morning hours of January 3, 2005, which led to the death of James Dillingham. Appellant had been apprehended in Nashville, Tennessee in late *Page 3 
January 2005. He was then transported to Toledo, Ohio, arriving in the early morning of February 5, 2005. After his arrival, Officer Michael Riddle, of the Toledo Police Department, interviewed appellant on two occasions, February 5 and February 7. As a result of incriminating statements that appellant made during these interviews, as well as other evidence gathered in the case, appellant was charged as noted above. Thereafter, appellant filed a motion to suppress the statements he made during those interviews. The lower court denied the motion after a hearing on the matter, and the case proceeded to a jury trial at which the following evidence was submitted.
 {¶ 11} James Dillingham had been a driver for the Childer's Limousine Service in Toledo, Ohio. On the afternoon of January 2, 2005, he went to the Upper Deck Bar on Laskey Road in Toledo with his friend and roommate Kenneth Northrup. Dillingham had recently cashed his paycheck of approximately $1,400 and was spending money freely at the bar, buying rounds of drinks for everyone in the bar. Dillingham also had a penchant for crack cocaine and prostitutes, and after spending the afternoon and early evening at the bar, he decided to leave in pursuit of both. Because Northrup disapproved of Dillingham's use of both and would not allow him to use drugs or engage the services of a prostitute in his home, Dillingham would often spend the night in one of several local hotels, including the Crown Inn near the intersection of Jackman and Alexis Roads in Toledo. Dillingham then called his coworker, Roman Avila, who met up with Dillingham at Northrup's home and drove Dillingham to the Crown Inn in Dillingham's *Page 4 
car. Avila then registered for the room, Room 25, in his own name, bought beer and a Molson-type beverage for Dillingham and then got a ride home with his brother.
 {¶ 12} At approximately 2:00 the next morning, David Simmons was driving home from a bar when his car broke down on Jackman Road. He pulled his car into the parking lot of a dialysis center next to the Crown Inn. After he determined that his car would not work, Simmons called his mother, who arrived at around 2:30 a.m. Shortly thereafter, as they were getting ready to leave, they heard a male voice yell "help me." They then heard a loud bang and then once more heard the voice say "help me." Simmons' mother then called 911. They then noticed a white minivan exit the Crown Inn parking lot. Simmons testified that the driver came to a stop, looked for traffic, then turned right onto Jackman Road, heading south. Simmons could not tell if the driver was male or female and stated that he only saw one person, the driver, in the van. He further testified that only one and one-half minutes passed between the time he heard the cries for help and the van exited the parking lot.
 {¶ 13} Officer Debra Baker of the Toledo Police Department was the first officer to arrive on the scene. As she investigated the Crown Inn parking lot, she discovered Dillingham's body lying on the sidewalk just outside of Room 25, between the door to the room and his car, that had been parked outside of the room. She then investigated Room 25. After determining that there were no other victims or suspects in the room, Baker secured the crime scene. Baker testified that the scene looked as though there had been a struggle in Room 25 and that there appeared to be blood stains on the wall and bed. *Page 5 
Baker also noticed coins on the floor. Shortly thereafter, additional police personnel arrived and took over the crime scene.
 {¶ 14} Officer Gerald Schriefer, a detective with the Scientific Investigation Unit ("SIU") of the Toledo Police Department, arrived to process the crime scene. Dillingham was lying on his back on the sidewalk in front of the door to Room 25. His face was covered in blood. There was also a blood trail leading from the bed to the victim, with blood smears on the bedspread, a blood smear on the wall by the bed and blood drops on the carpet. From the injuries to the victim's face, Schriefer believed that there had been a struggle, although not a "brawl." In processing the room, Schriefer found money totaling $89.12 on the floor and by the victim, an extractor rod from a revolver on the floor, empty Smirnoff beverage bottles, empty Bud Light beer bottles, a brown leather gun holster, a piece of notepad paper with the name Cathy and phone number on it, and a piece of glass pipe commonly known as a crack pipe. Schriefer processed the evidence for fingerprints and only found prints matching the victim.
 {¶ 15} Dr. Cynthia Beisser, a forensic pathologist in the Lucas County Coroner's Office, performed the autopsy on the body of James Dillingham and testified at the trial below. Beisser testified that Dillingham was five feet eleven inches tall and weighed 358 pounds. She stated that Dillingham had sustained blunt-force trauma to his head, as shown by lacerations on his forehead and top of his head and bruises behind his right ear, and that these injuries occurred prior to his death. The cause of Dillingham's death was a single gunshot wound to the chest. Beisser testified that the downward trajectory of the *Page 6 
bullet indicated that the victim was most likely shot while he was lying down. The bullet came to rest in the victim's back. Although medical treatment would not likely have saved Dillingham, Beisser testified that Dillingham likely lived for five to ten minutes after being shot and could have called for help in his injured condition. Officer William Goetz, also with SIU, attended the autopsy of Dillingham and testified at the trial below. Goetz stated that the projectile recovered from Dillingham was a single .22 caliber bullet.
 {¶ 16} Officer Michael Riddle was assigned as the lead investigator on the case. During the course of his investigation, Riddle called the phone number next to the name "Cathy" that was found on the note paper in Room 25. That led him to 291 E. Broadway, the address of Sandra Molinet. Molinet also testified at the trial below. Molinet stated that she had thrown a party on the night of January 2, 2005, that appellant, Cathy Barnett, Dennis Smith and Kelly Wing attended. She further testified that at this party, nearly everyone was smoking crack cocaine and many people were drinking alcohol. Molinet stated that Barnett and Wing were both prostitutes whom she knew and Dennis Smith was friend of hers. She had never met appellant before that night. Molinet stated that that evening, Dennis Smith asked her to put his gun away at her house. She then placed it in her dresser drawer. She stated that appellant, Barnett and Dennis Smith were all drinking alcohol and using cocaine at the party and that sometime after midnight appellant and Barnett left together. Several hours later, they returned to her house. Molinet testified that when appellant and Barnett returned, Barnett did not say a word, which was unusual for her. Molinet testified that appellant and Barnett left shortly *Page 7 
thereafter and she had not seen either of them since. The next day, Molinet discovered that the gun was missing from her dresser. When she asked Dennis Smith about it, he said he did not take it and seemed surprised that it was gone. The next day, Molinet also noticed a bloodied black t-shirt with the word SWAT on it in her basement. She knew that the shirt belonged to Dennis Smith and, not thinking, she put the shirt in the wash. Subsequently Dennis Smith asked for the shirt. Molinet also testified that she recalled seeing a law enforcement badge at some point which she believed belonged to Dennis Smith and that she had owned a pair of handcuffs which, approximately one week later, she noticed were missing.
 {¶ 17} In the course of his investigation, Riddle determined that appellant, Cathy Barnett and Dennis Smith acted in concert in the robbery and murder of Dillingham. A search of Dennis Smith's black Suburban uncovered two radio-type police scanners, two pairs of handcuffs, and a state of Ohio deputy sheriffs badge. The badge contained what appeared to be a blood stain on the back. Subsequent genetic testing revealed that the blood belonged to the victim.
 {¶ 18} Appellant telephoned Officer Riddle on January 7, 2005, from an unknown location. Initially he asked Riddle "What's this about?" Then he said: "We know what this is about." In talking with Riddle, appellant became upset and hung up the phone.
 {¶ 19} Appellant was subsequently apprehended in Tennessee and transported to Toledo where he was booked into the Lucas County Jail. At the trial below, the state called Terry Deal to testify. Deal had met appellant while they were both being *Page 8 
transported to Northwest Ohio. Deal testified that while being transported, appellant indicated he was being sent back to Ohio on a robbery charge and that appellant mentioned $1,300. He also mentioned that during the robbery someone pretended to be a cop. Finally, Deal stated that several times he heard appellant say "three people can keep a secret if two are dead."
 {¶ 20} At approximately 7:00 a.m. on February 5, 2005, appellant gave his first statement to Officer Riddle and Sergeant Maxwell. That statement was videotaped, which videotape was played for the jury at the trial below. In that interview, appellant initially denied involvement in Dillingham's death, but then admitted that he was involved. Although he stated that it was Kelly Wing and Dennis Smith's idea to "gank" Dillingham, appellant admitted that he wore the SWAT shirt and had the gun in a holster and the badge. Appellant stated that Dillingham was waiting for Cathy Barnett but that both Cathy and Kelly Wing initially went into the room. Cathy then signaled appellant to come in, but, appellant stated, when he entered the room Dillingham did not believe he was a cop. Appellant stated that Dillingham kept coming at him and that he, appellant, then shot the gun into the mattress. He even insisted that the officers return to the hotel room to find the bullet. Appellant told the officers that when he first shot the gun it fell apart, with some of it falling on the floor and some falling on the bed. He then believed that the gun was broken but, as the fight continued and as Dillingham tried to block the door, Kelly Wing picked up the gun and shot Dillingham. Appellant stated that although Dennis Smith planned the robbery, he did not recall Dennis Smith being in the room *Page 9 
during the assault. Appellant stated that after Dillingham was shot, Kelly and Cathy collected the money that was on the floor and the group left the scene in appellant's sister's van. Appellant also drew a sketch during the interview. The sketch depicted Room 25 at the Crown Inn and noted the placement of the bed, hot tub, victim and the positions of the other people in the room. After the assault, the group returned to Sandy's house. In his statement to the officers, appellant initially stated that he had been at the Express Motel that night. After confessing, however, he admitted that he was never at the Express Motel that night.
 {¶ 21} Two days later, on February 7, 2005, Officers Riddle and Maxwell interviewed appellant a second time at appellant's request. That interview was also videotaped and the video recording was also played for the jury at the trial below. At that interview, appellant initially stated that he wanted to clarify his statement. He then denied involvement in the crime and stated that everything he had told the officers about the crime in the first interview he learned from Kelly Wing and that he was only in Room 25 at the Crown Inn earlier in the evening partying with Dillingham and the others.
 {¶ 22} Also on February 7, 2005, Officer Schriefer returned to Room 25 and searched the mattress more closely. Schriefer found evidence of a bullet hole going through the mattress. He then removed the mattress and examined the frame underneath. There, Schriefer found a partial projectile that was damaged and which he testified looked like a "wad cutter," or practice round. *Page 10 
 {¶ 23} At the conclusion of the state's case, appellant moved for an acquittal pursuant to Crim.R. 29, which motion was denied. Appellant then presented his case, calling witnesses in an attempt to show that Dennis Smith and Kelly Wing were responsible for the robbery and death of Dillingham. Then, appellant testified in his own defense. His story differed markedly from the confession that he gave to Officers Riddle and Maxwell.
 {¶ 24} Appellant testified that he is a tattoo artist who owns either entirely or partially four tattoo shops in Northwest Ohio and Kentucky. He stated that he has attention deficit hyperactivity disorder ("ADHD") and bipolar disorder and that he takes medication for both. Appellant testified that on the evening of January 2, 2005, he went to a bar in East Toledo and ran into Kelly Wing, whom he had met the previous August. Kelly then asked him to take her to pick up a friend who was at the Crown Inn. At the Crown Inn, Kelly went to Room 25, then motioned for him to come to the room. In the room were Cathy Barnett and Dillingham. Appellant stated that after partying with them for about 30 minutes he and Kelly left and went to Sandy's house at 291 E. Broadway. There he met Dennis Smith as well as other individuals. Appellant testified that eventually Cathy Barnett came to Sandy's house and that at Sandy's, Dennis Smith began talking about dressing up like a cop to commit robberies. Appellant, Kelly and Cathy then left in his sister's white van and drove to the Express Inn where they met up with a guy named Jake and partied with him. Shortly thereafter, appellant gave Kelly money to buy more drugs and Kelly left in appellant's sister's white van. Appellant then testified *Page 11 
that when Kelly returned, she was upset and was talking about a robbery at the Crown Inn. Appellant stated that they then returned to Sandy's house where they found Dennis Smith sitting with a stack of bloody money and Dennis and the other people there passing around the gun. He then went to the basement where he saw Sandy with the bloody t-shirt.
 {¶ 25} Appellant then testified about his actions after leaving Sandy's house. Appellant stated the he, Kelly and Cathy left in his sister's van and went to the house of a man named Ted. While at Ted's, they watched the morning news and saw that a man named Dillingham had been killed at the Crown Inn and that the police were looking for a white Dodge Caravan. Appellant testified that it was then that Kelly pulled him aside to the bathroom and told him all about the incident. Cathy also became concerned because earlier in the evening she had turned a trick in Room 25 with Dillingham and with his friend Roman Avila. Appellant and Cathy then decided that they needed to leave town. Appellant's sister lived in Bowling Green, Kentucky and appellant needed to return her van to her, so over the course of several days, appellant and Cathy drove around. Then, appellant dropped Cathy at a Kroger store in Indianapolis, Indiana. Appellant testified that Cathy had family there. He then headed for Kentucky, but the van broke down in Louisville. Appellant spent the next couple of weeks traveling around doing tattoos at various tattoo parlors until he was arrested in Nashville. Appellant denied that he ever made incriminating statements in the presence of Terry Deal. *Page 12 
 {¶ 26} Regarding his earlier confession, appellant stated that all the information he gave to Officers Riddle and Maxwell about the crime he learned from Kelly Wing and that he told the officers what he thought they wanted to hear because he thought his life over. He specifically denied robbing or killing Dillingham and insisted that he was at the Express Motel at the time of the crimes.
 {¶ 27} On rebuttal, the state recalled Officer Riddle, who testified that he went to the Express Motel to confirm appellant's alibi. Riddle checked the guest register and learned that neither appellant, nor Cathy Barnett, nor Kelly Wing nor anyone named Jake rented a room on January 2 or 3, 2005.
 {¶ 28} At the conclusion of the trial, the jury returned verdicts of guilty on both the aggravated robbery and aggravated murder charges and determined that appellant did have a firearm on or about his person or under his control in the commission of those offenses. Subsequently, appellant was sentenced to serve a term of life in prison with parole eligibility after 20 years on the aggravated murder conviction, with an additional mandatory, consecutive term of three years for the firearm specification; and a term of eight years in prison on the aggravated robbery conviction, with an additional three years for the firearm specification. The eight year term was ordered to be served consecutive to the life term and the three year term on the second firearm specification was ordered to be served concurrently with the three year term on the first firearm specification, for a total sentence of life in prison with parole eligibility after 31 years. Appellant now challenges his conviction as follows. *Page 13 
 {¶ 29} In his first assignment of error, appellant contends that the trial court erred in denying his motion to suppress the statements that he made on February 5 and 7, 2005, while in police custody. Specifically, appellant contends that he invoked his Fifth Amendment right to counsel but was denied that request and that he did not knowingly and competently waive his Miranda rights.
 {¶ 30} When considering a motion to suppress, a trial court is in the best position to resolve factual questions and evaluate the credibility of witnesses. State v. Mills (1992), 62 Ohio St.3d 357, 366. When reviewing a trial court's ruling on a motion to suppress, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993),86 Ohio App.3d 592, 594. An appellate court must independently determine without deferring to a trial court's conclusions, whether, as a matter of law, the facts meet the applicable standard. State v. Klein (1991),73 Ohio App.3d 486, 488.
 {¶ 31} Pursuant to the United States Supreme Court's decision inMiranda v. Arizona (1966), 384 U.S. 436, a person who is taken into custody or otherwise significantly deprived of his freedom and subjected to interrogation by law enforcement officials must be informed of certain constitutional rights "and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible" as evidence against him. State v. Treesh (2001),90 Ohio St.3d 460, 470. Moreover, "[o]nce an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the *Page 14 
accused thereafter effects a valid waiver or himself renews communication with the police." State v. Knuckles (1992),65 Ohio St.3d 494, paragraph one of the syllabus. However, "the invocation of theMiranda right to counsel `requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" Davis v. United States (1994),512 U.S. 452, 459, quoting McNeil v. Wisconsin (1991), 501 U.S. 171, 178. Moreover, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis at 459. In Davis, the court held that an accused's remark that "maybe I should talk to a lawyer" did not constitute a request for counsel. Id. at 462.
 {¶ 32} Once an accused has invoked his right to counsel, however, that right can be waived. In North Carolina v. Butler (1979), 441 U.S. 369,373, the United States Supreme Court explained: "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in theMiranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in *Page 15 
at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."
 {¶ 33} The issue of waiver is determined by the totality of the circumstances in each case, including the defendant's background, experience, and conduct. Id. at 374. The state is required to prove only that appellant waived his right to remain silent by a preponderance of the evidence. Colorado v. Connelly (1986), 479 U.S. 157.
 {¶ 34} Appellant asserts that as soon as he arrived at the Lucas County Jail on February 5, 2005, he asked for a telephone to call an attorney he had previously used but that the request was denied pursuant to the orders of Officer Riddle. Shortly thereafter, appellant was taken to an interrogation room for the first interview. That interview was videotaped and the recording was reviewed by the trial judge in ruling on the motion to suppress. At the beginning of the interview, Officer Riddle stated "I have to read this. If you want to talk to us that's fine. If not, that's fine too." Riddle then read appellant theMiranda form. After reading appellant each section of the form which sets forth individually the Miranda rights, Riddle would pause and ask appellant if he understood. Appellant responded that he did each time. Riddle then wrote a "Y" next to each statement. At the bottom of the form appellant signed his name below the following statement: "I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me." Appellant *Page 16 
then spoke to Officer Riddle and implicated himself in the death of Dillingham. At no point during the interview and after he signed the waiver of rights form did appellant invoke his right to counsel.
 {¶ 35} At the beginning of the second interview, on February 7, 2005, which was evidently conducted at the request of appellant, Sergeant Maxwell followed the same procedure. Again, appellant acknowledged his understanding of his rights and again, he signed a waiver of those rights. Although appellant expressed frustration at not being allowed to call an attorney from jail, at no time, after signing the waiver did appellant invoke his right to counsel.
 {¶ 36} Appellant further asserts that his waiver of hisMiranda rights was not knowingly and competently given. He contends that when he was first interviewed, he had just arrived in Toledo after spending eight days in transit. He had not slept or eaten for some time and had not been given his medication for his ADHD and bipolar disorders.
 {¶ 37} In determining whether an accused knowingly, intelligently and voluntarily waived his Miranda rights, the court looks to the totality of the circumstances, including "`the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" In re Watson (1989),47 Ohio St.3d 86, 90, quoting State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. Absent evidence that a defendant's will was overborne and his capacity of *Page 17 
self-determination was critically impaired because of coercive police conduct, the decision of a suspect to waive his Fifth Amendment privilege is made voluntarily. State v. Dailey (1990), 53 Ohio St.3d 88,91-92.
 {¶ 38} The videotape of the first interview reveals that although appellant appeared slightly agitated at times, he was coherent and alert. In addition, the officers provided appellant with food, coffee and cigarettes. Nothing about appellant's demeanor suggests that he was unable to make decisions for himself or that his will was overborne. Given the totality of the circumstances, it is clear that appellant's waiver of his Miranda rights was knowing, intelligent and voluntary. Accordingly, the lower court did not err in denying the motion to suppress and the first assignment of error is not well-taken.
 {¶ 39} In his fourth assignment of error, appellant asserts that the lower court committed plain error in admitting into evidence at the trial below appellant's confession given during his first interview with police officers on February 5, 2005. Appellant contends that there must be some corroborating evidence outside of a confession tending to establish the "corpus delicti," before that confession is admissible as evidence against the confessor. Appellant misconstrues the corpus delicti rule. The rule was explained in State v. Nobles (1995),106 Ohio App.3d 246, 261-262 as follows:
 {¶ 40} "The corpus delicti rule, as employed in the context of extrajudicial confessions, is informed by a desire to protect unfortunate persons who confess to crimes that they not only did not commit themselves, but which were never committed by anyone. Before the rule was formed, it sometimes happened that a person would confess *Page 18 
to killing another, be convicted of that killing and put to death, only to have the supposed murder victim turn up later, alive and healthy. Therefore, the rule that there must be some evidence tending to prove the fact that death had actually [occurred] ensued; which was later followed by an additional requirement of some evidence that that death was brought about by some criminal agency.' State v. Maranda (1916), 94 Ohio St. 364, 370
 {¶ 41} "The rule survives in this form today, and is applied to all crimes, not homicide alone. Before an extrajudicial confession of a crime is competent to be admitted at the confessor's trial, the state must first introduce evidence independent of the confession tending to establish `(1) the act, and (2) the criminal agency of that act.'State v. Edwards (1976), 49 Ohio St.2d 31, * * * paragraph 1a of the syllabus. * * * The evidence presented need not be so strong that it is capable of persuading a factfinder on some element of the crime beyond a reasonable doubt, but `there must be some proof, not necessarily direct and positive, usually but circumstantial, tending to prove the fact that a crime was committed.' Id. at 371."
 {¶ 42} In the present case, it is undisputed that Dillingham died as a result of a criminal act. There was also evidence submitted in the trial below from which a jury could conclude that Dillingham was robbed. The fourth assignment of error is not well-taken.
 {¶ 43} In his fifth assignment of error, appellant challenges several of the trial court's evidentiary rulings and comments that the court made to the jury at the trial *Page 19 
below. It is well-established that the admission or exclusion of evidence is within the sound discretion of the trial court and a trial court's evidentiary ruling will not be reversed on appeal absent an abuse of that discretion. State v. Sage (1987), 31 Ohio St.3d 173, 182. An abuse of discretion connotes an attitude by the court that is arbitrary, unreasonable or unconscionable. State v. Long (1978),53 Ohio St.2d 91, 98.
 {¶ 44} First, appellant asserts that the lower court committed prejudicial error when it informed the jury, in the midst of the defense case, that the state had located Kelly Wing but the parties had chosen not to call her as a witness. The statement to which appellant refers, was made after the defense had rested its case. The court stated the following:
 {¶ 45} "Ladies and gentlemen, while we were in the recess, several things did occur. First of all, a particular person identified as a Kelly Wing was actually located and both parties, neither party, is going to call her as a witness even though she would be available.
 {¶ 46} "With that then, the defense, having that information available to them, has rested their case, and the State is now requesting a rebuttal case to be put on."
 {¶ 47} Appellant did not object to this statement. Without an objection by counsel, plain error must appear on the record and have affected the outcome of the case to be reversible on appeal. Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Long, supra at paragraph three of the syllabus. *Page 20 
 {¶ 48} A trial judge is presumed to have acted in a fair and impartial manner. In re Disqualification of Kilpatrick (1989), 47 Ohio St.3d 605,606. The trial judge, however, must be careful, particularly in a criminal trial, to insure that the judge's comments or participation do not result in prejudice to one of the parties. State v. Wade (1978),53 Ohio St.2d 182, 188, reversed on other grounds 438 U.S. 911. Although there is "no absolute prohibition" precluding comment by a court during trial, it must "be borne in mind that `* * * the influence of the trial judge on the jury is necessarily and properly of great weight * * *.' [Citation omitted.] Id. at 187 citing State v. Thomas (1973),36 Ohio St.2d 68, 71. Noting that certain improper remarks by the trial judge may prejudice a defendant's rights, the Ohio Supreme Court has held that "in determining whether a trial judge's remarks were prejudicial, the courts will adhere to the following rules: (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel." Wade supra at 188. The reversal of a conviction is justified if the defendant can show that a judge's comments or participation in a trial might have influenced a jury on issues of credibility or the weight to be given the evidence or interfered with defense counsel's ability to adequately represent his client. Id.; State v. Thomas (1973),36 Ohio St.2d 68, syllabus. *Page 21 
 {¶ 49} Applying the Wade factors to this case, we first note that there was absolutely no reason whatsoever for the trial judge to make the comments that he did. Although appellant had changed his story several times about his actions on the night in question, he had always been consistent in his assertion that Kelly Wing shot Dillingham. The trial judge's comments drew attention to the fact that although appellant knew Wing was available, he would not be calling her as a witness and would be resting his case. In our view, the court's comments were tantamount to a statement by the judge as to his view of appellant's credibility and his view of the defense case. Nevertheless, and despite trial counsel's failure to object to the improper comments, the trial judge did provide a corrective instruction when it charged the jury as follows: "If during the course of the trial the Court said or did anything that you consider an indication of this Court's view on the facts, you are instructed to disregard it." We have previously held that this method of correction is proper in that is does not draw unnecessary and unwarranted attention to the judge's comments yet, in effect, cures any possibility of an improper inference on the part of the jury.State v. Royster (Aug. 24, 1984), 6th Dist. No. L-83-406.
 {¶ 50} Accordingly, given that appellant waived all but plain error and that the lower court provided a corrective instruction to the jury below, appellant has not met his burden of establishing prejudicial error, and the lower court's comments were harmless.
 {¶ 51} Appellant next asserts that the lower court abused its discretion in allowing the state to recall Terry Deal. The state initially called Terry Deal and questioned him regarding statements that appellant made when the two of them were being transported to *Page 22 
Northwest Ohio. Deal initially did not recall any statements appellant may have made concerning a homicide. He also could not recall if appellant ever discussed the sum of $1,300. The state then asked him if a statement that he gave to police officers shortly after being with appellant would refresh his memory about what appellant said. Deal indicated that it would. During a break, Deal was given an opportunity to refresh his memory by reviewing the statement he had given to police earlier. The state then recalled Deal to the witness stand and he testified to the facts as set forth earlier in this decision. Prior to his continued testimony, the trial court reminded Deal that he was still under oath and "still under the same penalty for perjury should you go that route."
 {¶ 52} Evid.R. 612 provides in relevant part: "Except as otherwise provided in criminal proceedings by Rule 16(B)(1)(g) and 16(C)(1)(d) of the Ohio Rules of Criminal Procedure, if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Appellant's trial counsel was provided with a copy of the statement Deal gave to officers and fully cross-examined Deal about his recollection of statements appellant allegedly made. In addition, appellant has not asserted that his trial counsel was prevented from introducing into evidence those portions of the writing that appellant *Page 23 
believed relevant. In sum, appellant has not demonstrated that the lower court abused its discretion on this evidentiary issue.
 {¶ 53} Next, appellant argues that the lower court allowed, over objection, repeated references to the state's completely unsubstantiated theory that appellant killed Cathy Barnett. Appellant has not cited to any portion of the trial transcript in support of this assertion. "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error." State v.Watson (1998), 126 Ohio App.3d 316, 321. Where an appellant fails to support its assignment of error and argument with references to the record, an appellate court may summarily disregard that assignment of error. Id. Assuming appellant is referring to Deal's testimony regarding statements that appellant allegedly made while in transit (Deal testified that appellant said "three people can keep a secret if two are dead" and "I didn't know what was going through her mind, but I know the last thing that went through her mind"), we find the following discussion necessary.
 {¶ 54} Appellant objected to these statements on the grounds of speculation and hearsay, but the lower court overruled the objections. Appellant now asserts that references to the state's completely unsubstantiated theory that appellant killed Barnett were highly prejudicial and not supported by any credible evidence. Evid.R. 404(B) reads: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be *Page 24 
admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 55} The statements at issue amounted to evidence of other alleged crimes or bad acts not related to any of the exceptions in Evid.R. 404(B). Moreover, there was absolutely no evidence in the record below that Barnett was dead. Therefore, the probative value of these statements was substantially outweighed by the danger of unfair prejudice. Evid.R. 403(A). As such, the lower court abused its discretion in overruling appellant's objections to their admission. Nevertheless, "[w]here evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless `beyond a reasonable doubt' if the remaining evidence alone comprises `overwhelming' proof of defendant's guilt."State v. Williams (1983), 6 Ohio St.3d 281, 290, quoting Harrington v.California (1969), 395 U.S. 250, 254. In the present case, we find that the remaining evidence, in the form of appellant's own confession, comprises overwhelming evidence of his guilt and, as such, the trial court's admission of the statements was harmless.
 {¶ 56} Appellant further asserts that the lower court erred in allowing, again over objection, the state's attorney to engage in a battle of words with appellant. Again, appellant has not cited to any portion of the trial transcript in support of this assertion, although he did, in the facts section of his brief, reference an exchange between himself and the state's attorney when he was being cross-examined. Evid.R. 611(B) allows cross-examination on all relevant matters and matters affecting credibility. While several of the *Page 25 
prosecutor's questions were argumentative and testimonial in nature, and objections to them should have been sustained, we cannot say that appellant was prejudiced by admission of the evidence. Appellant chose to testify on his own behalf. In its cross-examination of appellant, the state questioned him repeatedly about the events of January 2 and 3, 2005, in an attempt to challenge his credibility. Although several of the state's questions were improper, they did not rise to the level of reversible error.
 {¶ 57} Finally, appellant asserts that the lower court erred in denying his request for a continuance of the sentencing hearing so that his counsel could review a videotape of an interview that appellant gave to Officer Riddle after appellant was found guilty of the offenses charged. Because appellant also raises this issue in his eighth assignment of error, we will address it therein.
 {¶ 58} The fifth assignment of error is not well-taken.
 {¶ 59} In his third assignment of error, appellant asserts that the lower court abused its discretion in giving the jury an instruction on flight over appellant's objection.
 {¶ 60} In the proceeding below, the court instructed the jury as follows:
 {¶ 61} "Flight. In this case there's evidence tending to indicate that the defendant fled or attempted to flee from the city of the alleged — or from the vicinity of the alleged crime. You are instructed that flight in and of itself does not raise a presumption of guilt, but unless satisfactorily explained, it tends to show consciousness of guilt or a guilty connection with the crime. *Page 26 
 {¶ 62} "If, therefore, you find that the defendant did flee or attempted to flee from the scene of the alleged crime and has not satisfactorily explained his conduct in doing so, you may consider this circumstance in the case in determining the guilt or innocence of the defendant."
 {¶ 63} It is well established that flight is admissible as evidence that tends to show consciousness of guilt. Sibron v. New York (1968),392 U.S. 40, 66. Further, a jury instruction on flight is appropriate if there is sufficient evidence in the record to support the charge. SeeUnited States v. Dillon (C.A.6, 1989), 870 F.2d 1125. A decision as to whether to issue a flight instruction rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. State v. Sims (1984), 13 Ohio App.3d 287, 289. Abuse of discretion requires more than simply an error in judgment; it implies unreasonable, arbitrary, or unconscionable conduct by the court.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 64} Flight from justice "means some escape or affirmative attempt to avoid apprehension." State v. Wesley, 8th Dist. No. 80684, 2002-Ohio-4429, citing United States v. Felix-Gutierrez (C.A.9, 1991),940 F.2d 1200, 1207.
 {¶ 65} We find that there was ample evidence to support a jury instruction on flight. Appellant told officers Riddle and Maxwell during the interview of February 5, 2005, that after the robbery and shooting of Dillingham, he immediately went into "duck and dodge mode." In particular, appellant knew that police would be looking for a white *Page 27 
Dodge Caravan and he had been driving his sister's white van. He and Cathy Barnett then took off out of town. The third assignment of error is not well-taken.
 {¶ 66} We will next address the sixth and seventh assignments of error together. Appellant asserts that because the verdict was not supported by sufficient evidence, the trial court should have granted his Crim.R. 29 motion for acquittal. Appellant further asserts that the verdict was against the manifest weight of the evidence.
 {¶ 67} The Supreme Court of Ohio has ruled that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997),78 Ohio St.3d 380, 386. "Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Under a manifest weight standard, however, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Thompkins, supra at 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses *Page 28 
and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weights heavily against conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172,175.
 {¶ 68} Appellant was convicted of violating R.C. 2911.01(A)(1), aggravated robbery, and R.C. 2903.01(B), aggravated murder. The aggravated robbery statute reads in relevant part:
 {¶ 69} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 70} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"
 {¶ 71} The aggravated murder statute provides:
 {¶ 72} "(B) No person shall purposely cause death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *."
 {¶ 73} Upon a review of the evidence submitted at the trial below, we must conclude that there was sufficient evidence to find appellant guilty of aggravated robbery *Page 29 
and aggravated murder and that the convictions were not against the manifest weight of the evidence. Through his confessions, appellant demonstrated an intimate knowledge of the crime scene. In addition, statements made by appellant, such as "The dude never should have come at me," and "I guess I just confessed," were particularly damning. Appellant also admitting to wearing the SWAT shirt and holding the badge and gun. He even admitted to firing the gun at the victim while the victim was on the bed and insisted that the officers return to the hotel room to find the bullet that went into the mattress. Appellant further insisted that Kelly Wing shot the victim while the victim stood in the doorway. Forensic evidence, however, in the form of the bullet's trajectory revealed that the victim was most likely shot while he was lying down. Finally, evidence revealed that the victim had recently been paid $1,400 and had a large amount of cash on him the evening of January 2, 2005. When he was discovered almost immediately after his death, however, he only had $89.12.
 {¶ 74} In view of the all of the evidence presented at the trial below, we cannot say that the verdicts were unsupported by the evidence or were against the manifest weight of the evidence and the sixth and seventh assignments of error are not well-taken.
 {¶ 75} In his eighth assignment of error, appellant asserts that the lower court erred in denying his motion for a new trial or, alternatively, granting him a brief continuance to allow the parties an opportunity to fully investigate and argue the merits of the motion. *Page 30 
 {¶ 76} Shortly after the jury verdicts were rendered below, appellant wrote two letters to the trial judge which the judge construed as motions for a new trial. At the October 19, 2005 sentencing hearing, appellant asserted that after the jury verdicts were rendered, Riddle interviewed him again and revealed that the state knew that Cathy Barnett was alive when they speculated at the trial that she was dead. Appellant's trial counsel asked the court for a continuance so that he could review the videotape. The court denied the request for a continuance but allowed appellant to argue the merits of his motion. The court then denied the motion for a new trial but ordered the state to provide appellant with a copy of the videotape.
 {¶ 77} The decision whether to grant a motion for a new trial pursuant to Crim.R. 33 is within the sound discretion of the trial court.State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. New trials are not to be granted lightly. Toledo v.Stuart (1983), 11 Ohio App.3d 292, 293. Crim.R. 33 sets forth six grounds on which a motion for a new trial may be granted. Appellant has not identified under which of these grounds he believes he is entitled to a new trial. The trial court held a hearing on appellant's motion at which appellant argued at length as to the merits of his motion. Although he did not have the videotape to present to the court, he explained the contents of the tape and the state did not contest his assertions. Under these circumstances, appellant has not made a clear showing that the trial court abused its discretion in denying the motion for a new trial. *Page 31 
 {¶ 78} Appellant also asserts that the lower court erred in denying his motion for a continuance of the sentencing hearing to give him time to review the videotape. It is well-settled that "[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion."State v. Unger (1981), 67 Ohio St.2d 65, 67. Appellant sought a one-week continuance to determine if any information on the tape was relevant to his motion for a new trial and/or judgment notwithstanding the verdict. The court denied the continuance but allowed appellant to argue at length that the contents of the tape demonstrated that Officer Riddle knew that Cathy Barnett was alive when he implied through his testimony that she was dead. Accordingly, the court did consider the issue that appellant had raised. The court then ordered the state to provide appellant's counsel with a copy of the tape. Because the lower court considered the issue raised by appellant, appellant has not demonstrated how he was prejudiced by the denial of his motion for a continuance. The eighth assignment of error is not well-taken.
 {¶ 79} Finally, in his second assignment of error, appellant contends that he was denied the effective assistance of counsel at his trial below. Appellant asserts that his trial counsel was ineffective in failing to request a competency evaluation of appellant despite appellant's history of psychiatric problems, failing to object to testimony of Deal and Gumpf, failing to disclose that he had a conflict of interest, and failing to develop appellant's alibi. *Page 32 
 {¶ 80} The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed under the Sixth Amendment, and (2) that the deficient performance prejudiced appellant's defense. Strickland v.Washington (1984), 466 U.S. 668, 686-687. In essence, appellant must show that his trial, due to his attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. Id. at 693.
 {¶ 81} Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Id. at 689. A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner. State v. Hamblin (1988), 37 Ohio St.3d 153, 155-56, sentence reversed on other grounds Hamblin v. Mitchell (C.A.6, 2003), 354 F.2d 482. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. State v.Phillips (1995), 74 Ohio St.3d 72, 85. Even if the wisdom of an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 48-49. Finally, reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners. Strickland, supra at 689;State v. Keenan (1998), 81 Ohio St.3d 133, 152. *Page 33 
 {¶ 82} On the issue of appellant's competency, the Supreme Court of Ohio has held that "[t]he term `mental illness' does not necessarily equate with the definition of legal incompetency." State v. Berry
(1995), 72 Ohio St.3d 354, syllabus. The court in Berry further stated at 359: "In Dusky v. United States (1960), 362 U.S. 402, 80 S.Ct. 788,789, 4 L.Ed.2d 824, 825, the United States Supreme Court set forth the test to determine whether a defendant is competent to stand trial, stating that `* * * the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.'" * * * The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains `sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." (Citations omitted.)
 {¶ 83} At the trial below, appellant testified in his own defense and stated that although he has ADHD and bipolar disorders, he takes medication for those disorders and prefers Neurontin because it allows him to function. Although appellant's trial counsel allowed him to ramble on about the events of January 2 and 3, 2005, nothing in appellant's testimony or in his videotaped statements previously given to police indicates that he did not understand the proceedings against him or was unable to assist in his defense. We therefore cannot say that appellant's trial counsel was ineffective for failing to request a competency evaluation. *Page 34 
 {¶ 84} Next, appellant asserts that his trial counsel was ineffective for failing to object to the testimony of Terry Deal and Mark Gumpf
 {¶ 85} Gumpf was an officer with the Lucas County Sheriffs Department who had transported appellant from the county jail to the courthouse for a hearing on appellant's request for new counsel. Gumpf testified that during the time he was with appellant, appellant made unsolicited comments about his case and specifically said, "They have enough on me. I'm going to go away for a long time." Appellant's trial counsel did not object but proceeded to cross-examine Gumpf. During that questioning, Gumpf admitted that appellant's statements were made in the context of his complaints about his prior counsel, that appellant never made any incriminating statements or admissions, and that he was basically talking about the beliefs of his prior counsel. Given that appellant's trial counsel chose to attempt to demonstrate the irrelevance of Gumpf s testimony through Gumpf himself, instead of objecting to it, this was a trial tactic that does not rise the level of ineffective assistance.
 {¶ 86} Appellant also asserts that his trial counsel was ineffective in failing to object to Gumpf s testimony because it demonstrated that appellant was in custody. After Gumpf testified, however, the court held an in-camera conference with the parties on this very issue. Appellant and his trial counsel discussed the issue, and appellant stated on the record that he did not want his counsel to move for a mistrial. Under these circumstances, we must conclude that the decision not to object to Gumpf s testimony on *Page 35 
the ground that it revealed that appellant had been incarcerated was one of trial strategy and did not rise to ineffective assistance.
 {¶ 87} We have previously discussed the testimony of Terry Deal. As we stated above, the Ohio Rules of Evidence permit a party to use a writing to refresh his memory before testifying. Rather than objecting, appellant's trial counsel cross-examined Deal, asking questions that challenged the accuracy of Deal's memory. Deal also admitted that appellant never confessed to his involvement in the crimes. Moreover, appellant's trial counsel did object to Deal's testimony that appellant had made statements indicating that a female involved in the crimes was dead. The trial court overruled the objections and we have discussed that issue above. Under these circumstances, it is clear that appellant's trial counsel's treatment of Deal as a witness was a matter of trial strategy and did not amount to ineffective assistance.
 {¶ 88} Appellant next contends that his trial counsel had a conflict of interest in that he represented Raymond Todd Lininger, who was approached about cooperating in the investigation of appellant. Appellant asserts that his trial counsel represented Lininger in an interview at which Officer Riddle questioned him about appellant. The transcript of the sentencing hearing reveals that appellant first raised the Lininger issue with his trial counsel, Merle Dech, when he first met Dech. Dech then asked appellant if appellant wanted him to withdraw as counsel. After discussing the issue, appellant determined that he wanted Dech to remain as his attorney. The name Lininger was never brought up at the trial and there was no testimony that tied Lininger to the investigation *Page 36 
of appellant in any way. Indeed, nothing in the record suggests that Lininger provided the state with any evidence incriminating to appellant. See, generally, State v. Manross (1988), 40 Ohio St.3d 180. Under these circumstances, we fail to see how appellant was prejudiced by Dech's representation of appellant and Lininger and cannot say that he was provided with the ineffective assistance of counsel on this ground.
 {¶ 89} Finally, appellant asserts that his trial counsel was ineffective for failing to develop appellant's alibi defense that he was at the Express Inn at the time of the robbery and murder of Dillingham. Whether or not there existed evidence to support the presentation of an alibi defense was clearly a matter within the professional judgment of trial counsel.
 {¶ 90} Accordingly, appellant has not established that he was prejudiced by any alleged ineffectiveness on the part of this trial counsel and his second assignment of error is not well-taken.
 {¶ 91} On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED. *Page 37 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Arlene Singer, J., CONCUR. *Page 1