[Cite as *State v. Robinson*, 2019-Ohio-558.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                        :

      Plaintiff-Appellee,              :              No. 17AP-853
                                               (C.P.C. No. 16CR-6326)

v.                                                         :

                                    (REGULAR  CALENDAR)

Anthony Robinson,                            :

      Defendant-Appellant.            :

---

D E C I S I O N

Rendered on February 14, 2019

---

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

**On brief**: *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Anthony Robinson, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of murder.

{¶ 2} On November 14, 2016, appellant was indicted on one count of kidnapping, in violation of R.C. 2905.01, two counts of aggravated murder, in violation of R.C. 2903.01, two counts of murder, in violation of R.C. 2903.02, and one count of tampering with evidence, in violation of R.C. 2921.12. Each count also carried a firearm specification. The indictment, which also named Jason J. Hicks as a defendant in Counts 1 through 5, arose out of the shooting death of Anthony Brown on October 12, 2016.

{¶ 3}  Appellant's case came for trial before a jury beginning October 23, 2017. Prior to trial, plaintiff-appellee, State of Ohio, requested a dismissal of Counts 1 (kidnapping) and 2 (aggravated murder).  The state also requested an amendment of Count 5 (felony murder) to allege only that the murder was the proximate result of the offender committing a felonious assault.

{¶ 4}  The first witness for the state was Columbus Police Officer Heidi Graber. On October 12, 2016, at 11:57 a.m., Officer Graber was dispatched to 480 East Markison Avenue following a report of shots fired in the area.  On arrival, Officer Graber observed a man "laying in the alley" bleeding from the mouth and chest. (Tr. Vol. II at 41.)  The officer subsequently learned the individual, identified as Anthony Brown, resided at 480 East Markison Avenue.  The back door of Brown's residence was open.  The front door "had been shot through, but it was still closed, and the dead bolt was on."  (Tr. Vol. II at 42-43.)  The residence is part of a duplex.

{¶ 5}  Columbus Police Officer Lisa Swisher is a member of the department's crime scene search unit.  On October 12, 2016, Officer Swisher was dispatched to 480 East Markison Avenue to photograph the crime scene and collect evidence.  Officer Swisher identified photographs of two bullet holes on the east side of 478 East Markison Avenue. The officer also identified a grill, located at the back of 522 East Markison Avenue, where a .40 caliber "Glock 23 generation 4" handgun had been recovered.  (Tr. Vol. II at 105.) The weapon's slide mechanism was in the back position, indicating "all the bullets have been fired and it has locked to the rear."  (Tr. Vol. II at 106.)  Officer Swisher prepared a diagram depicting various .40 caliber and .45 caliber shell casings found near the crime scene.

{¶ 6}  Demetri Robinson testified that he is a friend of Max Holder; Demetri owns a mobile food cart, and Holder assisted him with the cart.  Holder resided at 480 East Markison Avenue with Brown, also known as "Tone."  (Tr. Vol. II at 153.)

{¶ 7}  On October 12, 2016, at approximately 11:30 a.m., Demetri drove to 480 East Markison Avenue to pick up Holder.  As Demetri arrived at the residence, "another car pulled" up in front of him.  (Tr. Vol. II at 154.)  Demetri described the vehicle as a Chevrolet Impala, either dark blue or black in color; the vehicle had Tennessee license plates.  There were four individuals inside the vehicle.  Holder "came from around the

house, and he like waved to me or something." (Tr. Vol. II at 155.) Demetri testified Holder was gesturing "[l]ike one minute, * * * just give me a second." (Tr. Vol. II at 158-59.) Holder "went up to the car, and he said something to them." (Tr. Vol. II at 155.) Holder then "comes back to my car * * * and he said something to me through the window. Then he goes back to them." (Tr. Vol. II at 159.)

{¶ 8} Two men exited the Impala and began talking to Holder. Demetri could not hear the conversation but Holder appeared to be trying to explain something to them. Demetri testified: "After that he doesn't say anything to me, and he goes and gets in the car. And he gets in the middle in the backseat." (Tr. Vol. II at 160.) Demetri thought "it didn't feel right," especially since Holder was supposed to accompany him to set up the food cart. Demetri decided to follow the vehicle to find out "what's going on." (Tr. Vol. II at 161.) Demetri followed the vehicle to a Kroger grocery store on Parsons Avenue.

{¶ 9} On arriving at the store, Holder and "the big guy got out of the car and went inside." (Tr. Vol. II at 162.) Demetri parked his vehicle and then followed them inside the store. Demetri testified "somebody else from out of the car followed me in. Once they seen me going in, they followed me in." (Tr. Vol. II at 163.) Demetri purchased some items and spoke with Holder, who "told me to meet him * * * back at the house." (Tr. Vol. II at 162.) Demetri drove to the neighborhood but did not stop to pick up Holder "because the whole neighborhood said that Tone * * * got killed, got shot at the time." (Tr. Vol. II at 189.)

{¶ 10} Charles Mowery testified that he sometimes stays at 478 East Markison Avenue. Mowery knew a number of people in the neighborhood, including appellant. According to Mowery, appellant was "in and out of 478 a lot." (Tr. Vol. II at 227.) On the morning of October 12, 2016, Mowery spoke to appellant in front of the residences at 478 and 480 East Markison Avenue. Appellant asked Mowery to "go to the store to pick him up a pack of cigarettes." Mowery asked appellant "why he couldn't do it. And he told me he was waiting on somebody and he couldn't miss them." Appellant was wearing a "black hoodie." (Tr. Vol. II at 199.) Mowery went to a nearby store and bought some cigarettes. When Mowery returned, appellant was still in front of the duplex on East Markison Avenue.

{¶ 11} Approximately one-half hour later, Mowery was inside the residence at 478 Markison Avenue when he heard gunfire. One of the bullets struck the inside of 478 Markison Avenue, and Mowery "heard some glass breaking." (Tr. Vol. II at 202.) Mowery initially hid behind a refrigerator. He then got up and looked "out back" and observed a "dark gray or * * * a black-colored car, a sedan." (Tr. Vol. II at 203, 204.) Mowery observed four black males "out back. Three of them were getting into the car. One guy was running eastbound down the alley, and they backed out and headed north going towards Southwood." (Tr. Vol. II at 204.) One of the individuals "was wearing a black hoodie." (Tr. Vol. II at 239.)

{¶ 12} In October 2016, Alphonse Williams, whose nickname is "Big Al," resided at 483 Southwood Avenue, approximately one-half block from East Markison Avenue. (Tr. Vol. III at 258.) Brown, also known as "Tone," was a friend of Williams. (Tr. Vol. III at 261.)

{¶ 13} On the morning of October 12, 2016, Brown walked over to visit Williams. Brown was "a little frantic, and he was telling me a story about he think somebody circling his block." (Tr. Vol. III at 263.) Brown was "acting afraid and frantic." Brown asked Williams to "come over and check, and I was like all right." Both men walked to Brown's residence and "[c]hecked the inside. Went through the front. Checked. Didn't see nothing." (Tr. Vol. III at 265.) Williams remained for approximately 15 minutes and then returned to his residence.

{¶ 14} After returning to his residence, Williams "[h]eard shots." (Tr. Vol. III at 267.) He "ran out to the alley, and * * * could hear the pow, pow, pow, pow, pow, pow, pow." (Tr. Vol. III at 268.) The shots were coming from the direction of "Tone's house." (Tr. Vol. III at 269.) Williams "could see guys shooting," and he "could hear Tone screaming." (Tr. Vol. III at 270.) Williams observed a Chevrolet Impala "come down the alley from where Tone's house was." (Tr. Vol. III at 270.) The car windows were tinted, and he thought there might be "four or five people" inside the vehicle. (Tr. Vol. III at 271.) Williams did not observe any other vehicles in the alley at the time.

{¶ 15} After the vehicle left the area, Williams "could see a body laying in the alley." (Tr. Vol. III at 271.) A number of neighbors came over to the area. Williams dialed 911 and told the dispatcher he observed four black males in a vehicle.

{¶ 16} In October 2016, Monha Cooper resided at 482 East Markison Avenue. According to Cooper, the neighborhood had problems with drugs and weapons. Cooper knew Brown, who lived in the other half of the "double" or duplex. (Tr. Vol. III at 294.) Cooper also knew "Max," who resided with Brown. (Tr. Vol. III at 296.) Cooper testified Brown had a surveillance camera system at his residence. Cooper also knew appellant, who previously resided at 482 East Markison Avenue with his brother before Cooper moved there. Although appellant had moved, "he still came to the neighborhood" with his brother. Cooper would see appellant in the neighborhood "[a]bout every day." (Tr. Vol. III at 297.)

{¶ 17} On October 12, 2016, Cooper was inside her residence when she observed three individuals, including appellant, walking "by my side window." Cooper recognized appellant and Holder, but had "never seen the heavyset guy before." (Tr. Vol. III at 300.) The men had come "from the back" area of the duplex. (Tr. Vol. III at 301.) Cooper then looked out the front door and observed that "they went into the front yard by Tony's house." (Tr. Vol. III at 300.)

{¶ 18} Cooper heard gunshots "[a]bout a minute later." Cooper initially heard five or six shots, and she "hit the ground and covered [her] head." (Tr. Vol. III at 302.) The shots were coming from next door, toward the front of the house. Cooper thought she may have heard a couple more shots after she fell to the ground.

{¶ 19} After the shooting ended, Cooper went to the back door of her residence and observed a "dark car * * * on my side of the parking [area]. And a guy ran down the back alley with something, came back, [and] jumped in the car." (Tr. Vol. III at 303.) The individual running down the alley was dressed in "black clothing." Cooper testified that the "heavyset guy jumped in the driver's seat, and the guy that ran down the alley jumped in the back." (Tr. Vol. III at 304.) When Cooper had earlier observed appellant walking around the side of her residence, he was "dressed in black" clothing. (Tr. Vol. III at 305.) Cooper did not notice any difference between the clothing of the individual she saw running down the alley and the clothing appellant was wearing. The last time Cooper saw appellant in the neighborhood was on the date of the shooting.

{¶ 20} During Cooper's testimony, the state played video surveillance footage obtained from surveillance cameras located at Brown's residence at 480 East Markison

Avenue. Cooper identified Holder and the heavyset individual on the tape, and she also identified appellant on the tape as dressed in all black. Cooper testified the three individuals depicted on the video appeared to be walking toward Brown's residence.

{¶ 21} At trial, the parties stipulated that the "Big Guy" depicted in a Kroger store video, as well as in a surveillance video recovered from 480 East Markison Avenue, was Jason Hicks. (State's Ex. S.) It was further stipulated that "Jason Hicks was shot an undetermined number of times while on the porch of 480 East Markison Avenue, Columbus, Ohio, on October 12th, [2016] at or about 11:53 a.m.," and that "Hicks was then driven to Detroit, Michigan, to a hospital for treatment." (Tr. Vol. II at 148.) State's exhibit H-2, an "iPhone 7," was recovered in front of 482 East Markison Avenue and belonged to Hicks. (Tr. Vol. II at 148.)

{¶ 22} The parties also stipulated that, on October 10, 2016, "Natisha Hicks, the spouse of Jason Hicks, rented a 2015 Chevrolet Impala, Tennessee license plate Z7785M, from Hertz Rental Car * * * in Eastpointe, Michigan. The vehicle was due to be returned October 24th, 2016, but was actually returned on October 14th, 2016, to the same location." (Tr. Vol. III at 255.) Finally, it was stipulated appellant was arrested in Detroit, Michigan on November 3, 2016, and that Hicks "was taken into custody while in a Detroit hospital" on November 3, 2016. (Tr. Vol. III at 257.)

{¶ 23} Kelby Ducat, a firearms examiner employed by the Columbus Police Crime Laboratory, identified state's exhibit H-25 as a "Glock .40-caliber semiautomatic pistol." (Tr. Vol. III at 363.) The weapon was operable. Ducat testified that "the spent .40-caliber cartridge cases were fired from the Glock pistol." (Tr. Vol. III at 365.) Ducat was also asked to examine .45-caliber casings recovered from the scene. He opined that all four cartridge casings had been "fired from the same firearm." (Tr. Vol. III at 368.) He further opined that at least two firearms were fired at the scene.

{¶ 24} Dr. Donald Pojman, a forensic pathologist and deputy coroner for Franklin County, performed an autopsy on the shooting victim, Brown. Brown suffered a gunshot wound to the right chest, as well as a wound on the right side of his lower back. Dr. Pojman opined that Brown died as a result of "gunshot wounds to the torso, which covers the chest and abdomen." (Tr. Vol. IV at 413.)

{¶ 25} At the close of the state's case, counsel for appellant made a motion for a judgment of acquittal, pursuant to Crim.R. 29, which the trial court denied. Following deliberations, the jury returned verdicts finding appellant guilty of Count 5, murder, without a firearm specification, and not guilty of Counts 3, 4, and 6. The trial court filed a judgment entry on November 7, 2017, sentencing appellant to a term of imprisonment of 15 years to life.

{¶ 26} On appeal, appellant sets forth the following three assignments of error for this court's review:

> [I.] THE TRIAL COURT ERRED BY INSTRUCTING THE JURY THEY COULD CONSIDER THE DEFENDANT-APPELLANT'S FLIGHT AS CONSCIOUSNESS OF GUILT.
>
> [II.] THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTIONS FOR ACQUITTAL.
>
> [III.] THE VERDICT OF GUILTY TO MURDER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} Under the first assignment of error, appellant contends the trial court erred by instructing the jury on flight as consciousness of guilt. Appellant notes the trial court denied defense counsel's request that the court not provide such an instruction. Appellant maintains that his arrest in Michigan, three weeks after the offense, did not warrant a jury instruction on consciousness of guilt. According to appellant, the evidence at trial indicates he was known to move around from house to house, and it is not unusual in a neighborhood with a high crime rate for individuals to avoid making themselves available to law enforcement.

{¶ 28} At issue is the following instruction provided by the trial court to the jury:

> Testimony has been admitted indicating that the defendant fled the jurisdiction. You're instructed that flight alone does not raise a presumption of guilt, but it may indicate the defendant's consciousness of guilt. If you find the facts do not support that the defendant fled to Detroit, Michigan, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find the facts support that the defendant engaged in such conduct and if you decide that

the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

(Tr. Vol. IV at 510-11.)

{¶ 29} Under Ohio law, "[e]vidence of flight is admissible to show consciousness of guilt." *State v. Robinson*, 1st Dist. No. C-060434, 2007-Ohio-2388, ¶ 19. In this respect, "[f]light means some escape or affirmative attempt to avoid apprehension." *Id.* Further, "[a] jury instruction on consciousness of guilt based upon the flight of the accused is appropriate when supported by sufficient evidence in the record." *State v. Grindstaff,* 12th Dist. No. CA2013-09-074, 2014-Ohio-2581, ¶ 29. An instruction on flight "is treated as part of the overall jury instructions and is reviewed in the context of the entire jury instructions." *State v. Anderson,* 7th Dist. No. 03 MA 252, 2006-Ohio-4618, ¶ 108.

{¶ 30} An appellate court reviews a trial court's decision "to give or not to give a particular jury instruction under an abuse of discretion standard." *State v. Kaufman,* 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 103 (7th Dist.), citing *Sicklesmith v. Hoist,* 169 Ohio App.3d 470, 2006-Ohio-6137, ¶ 15 (7th Dist.). *See also State v. Smith,* 6th Dist. No. L-05-1350, 2007-Ohio-5592, ¶ 63 ("A decision as to whether to issue a flight instruction rests within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.").

{¶ 31} It has been noted that " '[e]vidence of flight to support an inference of guilt should generally be limited to situations when the activities associated with flight occur at a time and place near the criminal activity for which the defendant is on trial.' " *State v. White*, 2d Dist. No. 26093, 2015-Ohio-3512, ¶ 48, quoting *State v. Wood*, 2d Dist. No. 2010 CA 42, 2011-Ohio-2314, ¶ 30. However, "admissibility does not depend on how much time passes between the offense and the defendant's flight." *Id.*, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 169. Rather, "[t]he flight need not be immediate," and "[t]he instruction may be appropriate when the defendant, a long-time resident of the area in which the crime occurred, was arrested months later in another state or another part of the state." *Id.*

{¶ 32} In response to this assignment of error, the state argues the evidence presented was sufficient to raise an inference that appellant not only fled the scene immediately following the shooting, but that he then fled to Michigan. We agree.

{¶ 33} At trial, Mowery testified he spoke with appellant in front of Brown's residence "no more than a half hour" prior to the shooting. (Tr. Vol. II at 202.) Appellant asked Mowery to go to a nearby store to pick up cigarettes for him; appellant explained that he was "waiting on somebody and he couldn't miss them." (Tr. Vol. II at 199.) Mowery had known appellant for about a month prior to the shooting, and Mowery testified appellant was "in and out of 478 a lot." (Tr. Vol. II at 227.)

{¶ 34} Cooper, who lived next door to Brown, testified that, prior to the shooting, she saw appellant in the neighborhood "[a]bout every day." (Tr. Vol. III at 297.) Cooper testified that, approximately one minute prior to the shooting, she observed appellant and two other individuals walk by the side of her residence and then toward the front yard of Brown's residence; appellant was dressed in all black. Cooper testified that an individual she observed running down the alley after the shooting, who was also dressed in all black, got into the vehicle that drove away from the scene. Cooper had not seen appellant in the neighborhood since the events of October 12, 2016.

{¶ 35} The evidence also indicated that Hicks was with appellant shortly before the shooting. At trial, the parties stipulated that Hicks' wife rented the vehicle that witnesses observed leaving the scene of the shooting. It was further stipulated that Hicks received multiple gunshot wounds and was treated at a hospital in Detroit, Michigan.

{¶ 36} Here, there was evidence indicating appellant was frequently in the neighborhood prior to the shooting, but he had not been seen in the area following the incident. The state also presented the testimony of several witnesses who saw a dark-colored vehicle leaving the scene, and an individual was observed entering that vehicle wearing clothing that matched clothing worn by appellant that day. Approximately three weeks after the shooting, on November 3, 2016, Hicks, who was observed getting into the driver's seat of the vehicle leaving the scene, was arrested in Detroit, Michigan. On that same date, appellant was also arrested in Detroit, Michigan.

{¶ 37} On review, the evidence presented permitted a reasonable inference that appellant fled the scene of the shooting and traveled to Michigan to avoid apprehension,

and we find no abuse of discretion by the trial court in providing a flight instruction. *See*, *e.g.*, *State v. Woods*, 1st Dist. No. C-130413, 2014-Ohio-3892, ¶ 61 (trial court did not err in instructing jury on flight where state presented evidence that the defendant, a long-time resident of area in Cincinnati where shooting occurred, was captured several months later in Cleveland); *State v. Jackson*, 9th Dist. No. 11CA010012, 2012-Ohio-3524, ¶ 18 (flight instruction proper where evidence allowed reasonable inference defendant left the state shortly after crime to avoid apprehension); *State v. Pryor,* 5th Dist. No. 2017CA00122, 2018-Ohio-2712, ¶ 46 (sufficient evidence to warrant flight instruction where appellant fled jurisdiction immediately after assaulting victim and was found by United States Marshals two days later in Georgia).

{¶ 38} Appellant's first assignment of error is not well-taken and is overruled.

{¶ 39} Appellant's second and third assignments of error are interrelated and will be considered together. Under the second assignment of error, appellant argues the trial court erred by denying his Crim.R. 29 motion for judgment of acquittal because the evidence was insufficient to support his conviction for felony murder. Under the third assignment of error, appellant contends his conviction was against the manifest weight of the evidence. Appellant argues that none of the witnesses observed him fire a weapon, nor does the evidence indicate where he was located when the shooting began. Appellant maintains his mere presence at the crime scene was insufficient to support his conviction.

{¶ 40} In general, "[a] motion for judgment of acquittal, pursuant to Crim.R. 29, tests the sufficiency of the evidence." *State v. Darrington,* 10th Dist. No. 06AP-160, 2006-Ohio-5042, ¶ 15. As such, "an appellate court reviews a trial court's denial of a motion for acquittal using the same standard for reviewing a sufficiency of the evidence claim." *Id.* In considering "whether the evidence is legally sufficient to support the jury verdict as a matter of law, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson,* 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 41} In contrast to a sufficiency argument, a manifest weight of the evidence challenge "questions whether the state met its burden of persuasion." *State v. Adhikari*,

8th Dist. No. 103935, 2017-Ohio-460, ¶ 47, citing *State v. Bowden,* 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. In considering such a challenge, "[a] reviewing court 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.,* quoting *State v. Thompkins,* 78 Ohio St.3d 380, 388 (1997). Further, "[a] conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*

{¶ 42} In the present case, the jury returned a verdict finding appellant guilty of Count 5, felony murder. R.C. 2903.02(B) states in part: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." The underlying felony under Count 5 was felonious assault, in violation of R.C. 2903.11. Pursuant to R.C. 2903.11(A)(2), "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon." At trial, the jury was instructed that appellant "may be convicted as a principal offender or as a complicitor or an aider and abetter to any or all counts and specifications." (Tr. Vol. IV at 511.)

{¶ 43} We first consider appellant's challenge to the trial court's denial of his Crim.R. 29 motion for judgment of acquittal based on a sufficiency argument. In reviewing the record, the state presented testimony indicating appellant was standing in front of 480 East Markison Avenue (Brown's residence) on the morning of the incident. Mowery testified that he spoke with appellant approximately one-half hour prior to the shooting; appellant told Mowery that he was waiting for someone and could not leave. He asked Mowery to go to a nearby store for cigarettes.

{¶ 44} At trial, the state introduced and played for the jury surveillance video obtained from two cameras located at Brown's residence. The video from one camera (hereafter "Camera No. 1") depicts an outside view of Brown's front porch area, angled to include views of the front yard of 482 East Markison Avenue and the street itself. Video from the other camera (hereafter "Camera No. 2") depicts the area directly outside the front door of Brown's residence.

{¶ 45} The state also presented the testimony of Cooper, who resided at 482 East Markison Avenue, next door to Brown's residence. Approximately one minute before the shooting, Cooper observed appellant and two other individuals walk "by [her] side window" and proceed "into the front yard by Tony's house." (Tr. Vol. III at 300.) The state played portions of the surveillance video during Cooper's testimony.

{¶ 46} Camera No. 1 depicts three individuals walking around to the front of 482 East Markison Avenue; the tape indicates a time of 11:51 a.m. Cooper identified appellant and Holder as two of the three individuals depicted on the video, and it was stipulated that the heavyset individual appearing on the video was Hicks. Cooper confirmed appellant was the individual in the video wearing all black clothing. Holder appears first in the camera frame, followed by Hicks, and then appellant. Appellant is the individual closest to the porch, with his hands in his pockets, while Hicks and Holder approach the direction of 480 East Markison Avenue. All three individuals disappear from view of Camera No. 1 shortly before 11:52 a.m.; appellant is last observed walking toward the front of the duplex, and Hicks appears to glance in that direction as he walks toward Brown's residence.

{¶ 47} The state's theory of the case, as summarized during closing argument, was that appellant fired the shots that struck Brown while standing off to the side of Brown's front porch (in an area where several .40-caliber shell casings were recovered). Specifically, the state argued that as Hicks and Holder approached the front porch of Brown's residence (480 East Markison Avenue), appellant stood off to the side in a small "cut out" area between the porches of 482 and 480 East Markison Avenue. (Tr. Vol. IV at 438.)

{¶ 48} At trial, the state played footage from Camera No. 2 showing Hicks and Holder approaching the front porch of Brown's residence. Holder initially walks up to the front door, and an individual inside the residence is depicted opening the front door slightly. Holder then steps back off the porch and Hicks walks onto the porch and stands at the front door; Hicks appears to be engaged in a discussion with the individual standing inside. A short time later, at 11:52 a.m., Holder looks surprised and backs away as Hicks exits the camera frame, heading in the direction of 482 East Markison Avenue. The video depicts the door opening wider and a shell casing appears to fly across the screen.

{¶ 49} The state introduced evidence that three .40-caliber shell casings were found in the cut out area between 480 and 482 East Markison Avenue, and two more .40-caliber casings were found on the porch of 482 East Markison Avenue. The state argued at trial the evidence indicated the bullets fired toward 480 East Markison Avenue were fired at an angle (i.e., east to west), including evidence of bullet strikes to the residence at 478 East Markison Avenue.

{¶ 50} According to the state's theory, after the initial shots were fired, appellant and Hicks ran around the side of 482 East Markison Avenue to the back alley, where a Chevrolet Impala was parked; at the same time, Brown was running out the back door of his residence (presumably unaware of the vehicle parked in the back). The state introduced evidence that Brown was shot in the back after exiting his residence, and police recovered a .40-caliber shell casing located in the rear of the duplex. Authorities also recovered a .40-caliber Glock from a nearby outdoor grill, located at 522 East Markison Avenue. The state's ballistics examiner testified the spent .40-caliber cartridge cases were fired from the Glock found in the grill.

{¶ 51} Cooper provided testimony that, after the shooting ended, she went to her back door and observed a dark-colored vehicle parked in the back. Cooper observed Hicks enter the car and observed another individual who "ran down the back alley with something, came back, [and] jumped in the car." (Tr. Vol. III at 303.) Cooper, who testified appellant was wearing all black clothing when she observed him walking by her house just prior to the shooting, stated the individual who ran down the alley was also wearing all black clothing. Cooper did not notice any differences between the clothing of the individual running down the alley and the clothing worn by appellant that day. Several of the state's witnesses observed a dark-colored vehicle leaving the area after the shooting, and Williams identified the vehicle as a Chevrolet Impala.

{¶ 52} As previously noted, it was stipulated at trial that Hicks' spouse rented a 2015 Chevrolet Impala on October 10, 2016 in Eastpointe, Michigan. It was further stipulated that Hicks suffered an undetermined number of gunshot wounds while on the porch at 480 East Markison Avenue, and he was driven to a hospital in Detroit, Michigan, for treatment of his wounds. On November 3, 2016, law enforcement authorities arrested

Hicks in a hospital in Detroit, Michigan; on that same date, appellant was also arrested in Detroit, Michigan.

{¶ 53} Construing the evidence most strongly in favor of the prosecution, we conclude the state provided sufficient evidence to support appellant's conviction for the felony murder of Brown. The fact that none of the state's witnesses observed appellant fire the shots is not dispositive; rather, as noted by the state, eyewitness testimony that he fired the weapon is not required to sustain a conviction. *See State v. Walker,* 8th Dist. No. 99998, 2014-Ohio-1827, ¶ 22, citing *State v. Lopez*, 8th Dist. No. 94312, 2011-Ohio-182, ¶ 62, citing *Jenks* ("While there was no eyewitness testimony identifying [the defendant] as the shooter, such evidence is not required in order to sustain a conviction."). Further, under Ohio law, "[c]ircumstantial evidence and direct evidence have equivalent probative value." *State v. Wood*, 2d Dist. No. 26134, 2016-Ohio-143, ¶ 38. In this respect, " 'reasonable inferences may be drawn from both direct and circumstantial evidence.' " *State v. Toney,* 7th Dist. No. 14 MA 0083, 2016-Ohio-3296, ¶ 28, quoting *State ex rel. Hardin v. Clermont Cty. Bd. of Elections,* 12th Dist. No. CA2011-05-045, 2012-Ohio-2569, ¶ 66. Here, viewed in a light most favorable to the prosecution, the direct and circumstantial evidence presented, along with the reasonable inferences to be drawn therefrom, was sufficient to support appellant's conviction, either as principal or as an aider and abettor, for felony murder. Accordingly, the trial court did not err in denying appellant's Crim.R. 29 motion for judgment of acquittal.

{¶ 54} Further, after reviewing the entire record, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. Thus, appellant's conviction for felony murder was not against the manifest weight of the evidence.

{¶ 55} Based on the forgoing, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.

_____