[Cite as *State v. Davenport*, 2019-Ohio-2297.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-393 |
| v. | : | (M.C. No. 2018CRB465) |
| Tracy Davenport, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-395 |
| v. | : | (M.C. No. 2018CRB464) |
| Destiny Jones, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 11, 2019

**On brief:** *Zachary M. Klein*, City Attorney, and *Isaac J. Rinsky*, for appellee. **Argued:** *Isaac J. Rinsky*.

**On brief:** *Todd W. Barstow*, for appellant Tracy Davenport. **Argued:** *Todd W. Barstow*.

**On brief:** *Parks and Meade, LLC*, and *Darren L. Meade*, for appellant Destiny Jones.

APPEALS from the Franklin County Municipal Court

KLATT, P.J.

{¶ 1}   Defendants-appellants, Tracy Davenport and Destiny Jones, appeal from judgments of conviction and sentence entered by the Franklin County Municipal Court following a jury trial.  For the following reasons, we affirm.

{¶ 2}    On January 8, 2018, Davenport was charged by complaint in Franklin M.C. No. 18CRB465 with criminal damaging or endangering in violation of R.C. 2909.06(A)(1), a misdemeanor of the first degree, and assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.[1]  On the same day, Jones was charged by complaint in Franklin C.P. No. 18CRB464 with assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.[2]  All charges arose from an incident occurring on May 18, 2017.  Upon motion of the prosecution and by agreement of the parties, the charges against Davenport and Jones were consolidated for purposes of trial.

{¶ 3}   Following a jury trial, Davenport was acquitted of assault, but found guilty of criminal damaging or endangering.  Jones was found guilty of assault.  The trial court filed judgment entries in accordance with the jury verdicts. Thereafter, the trial court sentenced Davenport and Jones in accordance with law.

{¶ 4}   Davenport and Jones separately appealed their convictions.  Davenport's appeal was docketed under case No. 18AP-393; Jones' appeal was docketed under case No. 18AP-395. This court sua sponte coordinated the cases for purposes of oral argument. Accordingly, we shall address appellants' appeals together.

{¶ 5}   The state presented the following evidence at trial.  Shatoya Snow testified that her mother, Lisa Snow, lived in an apartment complex on Hanford Street.  Davenport lived in a different building in the same apartment complex.  Although Shatoya had seen Davenport and her daughter, Destiny Jones, around the neighborhood, neither she nor her mother were friends with them.

{¶ 6}   Late in the afternoon on May 18, 2017, Shatoya drove past Davenport's apartment on the way to Lisa's apartment.  Shatoya observed Jones standing in the doorway

---

[1]  In addition, Davenport was charged in Franklin M.C. No. 17CRB010566 with assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.  Davenport was acquitted of this charge.  The record before this court involves only the charges filed against Davenport in Franklin M.C. No. 18CRB465.

[2]  In addition, Jones was charged in Franklin M.C. No. 17CRB010567 with assault in violation of R.C. 2903.13(A), a misdemeanor of the first degree.  Jones was acquitted of this charge.  The record before this court involves only the charge filed in Franklin M.C. No. 18CRB464.

of Davenport's apartment. Shatoya continued the short drive to Lisa's building and stopped in front of it.   Lisa exited her apartment and got in the passenger side of Shatoya's car. Neighborhood logistics required Shatoya to exit the apartment complex the same way she entered, which again involved driving past Davenport's apartment. When Shatoya stopped at the stop sign at the intersection of Hanford Street and Burstock Road, she saw Jones run out of Davenport's apartment "coming straight towards my car" with "a weapon in her hand." (Tr. at 146.)  Shatoya exited her car in order to stop Jones from hitting it with the weapon.   As Shatoya and Jones "were coming up to each other," Lisa exited the car; Davenport came "around the corner [with] another girl * * * and maybe a guy." *Id.* at 147- 48. Davenport carried a metal pole with her; she and the other two people approached Lisa and "were trying to attack her." *Id.* at 148.

{¶ 7}   Shatoya retrieved a taser from her car.  She activated it, and the group "stepped back" momentarily. *Id.* at 150.  However, when Shatoya returned to her car, the female that was initially with Davenport was standing near the open driver's side door. *Id.* Jones joined the female and the two pinned Shatoya against the open car door.  According to Shatoya, her back was toward the door; the female was "in front" of her and Jones was "on top" of the female.  *Id.* at 151.  Both the female and Jones struck Shatoya repeatedly. While Shatoya was still pinned against her car, Davenport struck her in the forehead with the metal pole.

{¶ 8}   Shatoya further testified that Davenport struck the passenger side window of her car with the metal pole; Jones removed the car keys from the ignition and threw them into a storm sewer.  After Davenport and Jones left the scene, Shatoya went to a neighbor's house to call the police.

{¶ 9}   At some point after the incident, Shatoya was contacted by a woman who claimed to have taken a cell phone video at the scene.  The woman emailed the video to Shatoya.  Shatoya testified that the video "fairly and accurately depict[ed] what happened at [the] scene." *Id.* at 157.

{¶ 10}   During Shatoya's testimony, the state played the cell phone video for the jury. (State's Ex. 3.) The video depicts the neighborhood where the incident took place. A car is parked at the stop sign; both front doors are open.  A woman wearing a light green top is walking near the driver's side of the car.   A woman wearing a gray top is fighting with a

woman wearing black leggings and a red top. The woman in the red top eventually pins the woman in gray against the open driver's side door of the car. A woman wearing a white top joins the woman in the red top in pinning the woman in gray against the car door. A woman dressed in all red is carrying a metal pole; she briefly stands next to the driver's side door of the car. At this point, the video depicts a pole being swung on the driver's side of the car; a loud noise is heard emanating from that area. The woman in all red walks around the back of the car to the passenger side; she then walks to the front of the car and hits the hood with the metal pole. At this point, the woman in gray is still pinned against the driver's side door by the woman in the red top. The video also depicts the woman in all red retrieve a purse from the car and throw it on the ground. The woman in the white top picks up the purse and throws it into a nearby storm sewer. As she walks back toward the car, she punches the woman in the light green top.

{¶ 11} Shatoya identified the woman in gray as herself, the woman in light green as Lisa, the woman in all red as Davenport and the woman in the white top as Jones. She did not know the identity of the woman who initially pinned her against her car. Shatoya further identified the noise heard in the video as "Ms. Davenport busting the side of my windows." (Tr. at 165.)

{¶ 12} Shatoya testified that the metal pole striking her car caused damage to it. She also testified that she and others were "[a]ctually touching the vehicle" while the windows were being smashed out. *Id.* at 169. She stated that she was "sitting on" the vehicle "when the pole came down." *Id.*

{¶ 13} On cross-examination, Shatoya admitted that in her statement to police following the incident, she did not identify Jones as one of the people who attacked her. *Id.* at 178. She also stated that she could not "recall" telling the police that it was Jones and not Davenport who struck her with the metal pole. *Id.*

{¶ 14} Lisa Sn0w also testified about the events of May 18, 2017. Lisa averred that Shatoya picked her up in front of her apartment on Hanford Street. As Shatoya drove down the street, Jones "came running out of somewhere, hollering, 'Stop.' " *Id.* at 188. When Shatoya stopped her car, "[p]eople just came flying out of nowhere." *Id.* She and Shatoya exited the vehicle; both stood on the driver's side of the car. According to Lisa, "[t]here was just so much chaos that day." *Id.* At one point, she saw Shatoya "fighting Destiny and some

other girl." *Id.* Lisa described the fight as occurring "at the corner of [Shatoya's] car door." *Id.* at 189. Davenport swung a metal pole she was carrying at Lisa. Lisa caught the pole in her hand; however, Davenport "backed up and swung again," hitting Lisa in the lip. *Id.* Thereafter, Lisa saw Davenport "trying to bust out the windows in the car with the pole." *Id.* at 192. Davenport then grabbed Shatoya's keys and purse from the car and threw them on the ground; Jones threw the items into a storm sewer.

{¶ 15} According to Lisa, Shatoya then went to a neighbor's house; Lisa began walking toward her house. Two men approached Lisa and lifted up their shirts in an apparent effort to show her they had guns tucked in the waistbands of their pants. When Shatoya shouted that the police were coming, the two men ran away.

{¶ 16} During Lisa's testimony, the state again played the cell phone video for the jury. She identified Jones and another woman "fighting Shatoya up at the corner of [Shatoya's] car." *Id.* at 196. She also identified Davenport as holding a metal pole; a sound on the video was of Davenport "busting windows out." *Id.* at 197. She further identified Jones as the person who "swung on [her]." *Id.* at 199. She testified that although she could not recall if Jones merely attempted to strike her or whether Jones made actual contact with her, the video established that Jones successfully struck her. *Id.*

{¶ 17} On cross-examination, Lisa admitted that she told the police after the incident that she was seated in Shatoya's car when Davenport broke the car windows, but that the video depicts her standing outside the car when Davenport struck it.

{¶ 18} Columbus Police Officers Alan Bennett and Jacob Velas also testified on behalf of the state. According to their testimony, at 4:18 p.m., on May 18, 2017, they separately responded to a reported assault at the intersection of Hanford Street and Burstock Road. Upon arrival at the scene, they observed a vehicle with its doors open parked on Hanford; the rear passenger window was broken out. Both officers described the scene as chaotic. Bennett spoke to Shatoya and Lisa, both of whom named Davenport and Jones as the perpetrators of the assault. Lisa had a cut on her lip; Shatoya had a gash on the top of her head. Velas averred both victims had blood on their faces and clothing and were "very distraught, in a panic, very scared." *Id.* at 224.

{¶ 19} The officers were informed that Davenport and Jones had run to the apartment of Mary Davenport.[3]  Bennett, Velas, and three other police officers made "numerous attempts" to make contact with Davenport and Jones at the apartment, which included repeatedly knocking on the door and using a bullhorn directing the woman to exit the apartment.  *Id.* at 227.  According to Velas, the apartment's upstairs windows were cracked open. Mary Davenport eventually arrived and provided the police with a key and permission to enter her apartment.   Velas estimated that he and the other officers were outside the apartment for "over an hour."  *Id.*

{¶ 20} When the police entered the apartment, both Davenport and Jones were seated on couches.  Davenport told police that Shatoya and Lisa had come to her apartment and began arguing with her; after Davenport was maced in the face, a fight ensued.  The police eventually arrested Davenport and Jones without incident.

{¶ 21}  Mary Davenport testified on behalf of appellants.  She averred that late in the afternoon on May 18, 2017, the manager of her apartment complex called her at work and reported that the police were at her apartment.  She left work and drove home.  When she arrived at her apartment, she saw several police officers, as well as Lisa and Shatoya, standing outside.  According to Mary, Lisa and Shatoya were "angry."  *Id.* at 256.  The police told her that Davenport and Jones were inside.  After speaking on the phone with the two women, she granted the police permission to enter her apartment.   She averred that she did not let the police into her apartment until "somewhere around" 6:00 p.m.  *Id.* at 260.

{¶ 22}  Paul Clark also testified on behalf of appellants.  He averred that on May 18, 2017, he tried to drive into the apartment complex but could not because there was "a commotion" near a car parked at the intersection of Hanford and Burstock.  *Id.* at 263.  According to Clark, he observed a woman in a white top, who was not part of the "commotion," standing nearby, "kind of bent over." *Id.* at 264.

{¶ 23}  Clark further testified that he saw "a tall, Olive Oyl type skinny girl fighting a shorter girl."  *Id.* at 270.  According to Clark, the "smaller girl had a taser and tased this tall girl right in her forehead. And [the tall girl] took it and took the taser from her, bent her over the car, and hit her twice."  *Id.* at 272.  He also observed a woman dressed in all red hit "the window part" of the rear passenger door of the car with a metal pole.  *Id.* at 270.  The

---

[3]  Mary Davenport is the mother and grandmother of Davenport and Jones, respectively.

woman then walked on the passenger side to the front of the car and hit the hood with the pole. He did not see the woman near the driver's side of the car, nor did he see her strike anyone with either the pole or her hands.

{¶ 24} During Clark's testimony, the state again played the cell phone video for the jury. Clark described "the Olive Oyl girl" as wearing a red top. *Id.* at 278-79. Clark opined that the woman in the video wearing white was "too thin to be" Jones. *Id.* at 279. According to Clark, the "Olive Oyl" woman eventually left the scene and did not return. The woman in red left and walked into an apartment. He did not see the woman in white enter that apartment or "swing on anybody." *Id.* at 296. Clark reiterated that the "short girl was hit * * * on the top of the head, closer towards the forehead" by "[t]he taller brown skinned girl" he referred to as "Olive Oyl." *Id.* at 298. He averred that he saw the woman in red hit the car, not a person.

{¶ 25} As noted above, in case No. 18AP-393, Davenport appeals her conviction for criminal damaging or endangering in violation of R.C. 2906.06(A)(1). Davenport sets forth a single assignment of error for this court's review:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HER GUILTY OF CRIMINAL DAMAGING OR ENDANGERING AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 26} In her sole assignment of error, Davenport argues that her conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. This court disagrees.

{¶ 27} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Gravely,* 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 41, citing *State v. Thompkins,* 78 Ohio St.3d 380, 1997-Ohio-52, paragraph two of the syllabus.

{¶ 28} In *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, the Supreme Court of Ohio set forth the role of an appellate court presented with a challenge to the sufficiency of the evidence:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * * *Id.* at paragraph two of the syllabus.

{¶ 29} "Whether the evidence is legally sufficient is a question of law, not fact." *Gravely* at ¶ 43, citing *Thompkins* at 386. "[I]n determining the sufficiency of the evidence, an appellate court must give 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.,* citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). "Consequently, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact." *Id.,* citing *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79 and *State v. Thomas,* 70 Ohio St.2d 79, 80 (1982). An appellate court may not disturb a verdict unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *Id.* at ¶ 43, citing *State v. Treesh,* 90 Ohio St.3d 460, 484, 2001-Ohio-4 and *Jenks.*

{¶ 30} A manifest weight of the evidence claim, however, requires a different review. *Id.* at ¶ 44. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered to support one side of the issue rather than the other." *Id.,* citing *State v. Brindley,* 10th Dist. No. 01AP-926, 2002-Ohio-2425, ¶ 16. An appellate court presented with a challenge to the manifest weight of the evidence must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.,* citing *Thompkins* at 387. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.,* quoting *Thompkins.*

{¶ 31} An accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. *Id.* at ¶ 45, citing *State v. Raver,* 10th Dist. No. 02AP-04, 2003-Ohio-958, ¶ 21. Further, a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the appellant's version. *Id.,* citing *State v. Gale,* 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19 and *State v. Williams,* 10th Dist. No.08AP-719, 2009-Ohio-3237, ¶ 17. The trier of fact is free to believe or disbelieve any or all of the testimony. *Id.,* citing *State v. Jackson,* 10th Dist. No. 01AP-973, 2002-Ohio-1257 and *State v. Sheppard,* 1st Dist. No. C-000553 (Mar.19, 2002). The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *Id.,* citing *State v. Williams,* 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58 and *State v. Clarke* 10th Dist. 01AP-194 (Sept. 25, 2001). Accordingly, an appellate court must ordinarily give great deference to the fact finder's determination of the witnesses' credibility. *Id.,* citing *State v. Covington,* 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 28 and *State v. Hairston,* 10th Dist. No. 01AP-1393, 2002-Ohio-4491, ¶ 74.

{¶ 32} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379 at ¶ 46, citing *State v. Braxton,* 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 15, citing *State v. Roberts,* 9th Dist. No. 96CA006462 (Sept. 27, 1997). Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Id.,* citing *Braxton*.

{¶ 33} Criminal damaging or endangering is proscribed by R.C. 2909.06(A)(1), which provides that no person, knowingly, by any means, shall cause, or create a substantial risk of physical harm to any property of another without the person's consent. R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.01(A)(8) defines "[s]ubstantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a

certain result may occur or that certain circumstances may exist."  R.C. 2901.04(A)(4) defines "[p]hysical harm to property" as "any tangible or intangible damage to property that, in any degree, results in loss to its value or interferes with its use or enjoyment."  Such harm to property "does not include wear and tear occasioned by normal use." *Id.*

{¶ 34} Criminal damaging or endangering is a misdemeanor of the second degree, unless the violation "creates a risk of physical harm to any person," in which case the offense is a misdemeanor of the first degree. R.C. 2909.06(B).[4]  Under R.C. 2901.01(A)(7), " '[r]isk' means a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(3) defines "[p]hysical harm to persons" as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

{¶ 35} The complaint charging Davenport with criminal damaging or endangering reads in pertinent part:

> Complainant, being duly sworn, states that [Davenport] * * * on or about the 18th day of May, 2017 * * * did knowingly cause or create a substantial risk of physical harm, by any means, to property of Shatoya Snow, to wit: smashing the windows of a vehicle, without her consent.  Furthermore, and the violation of this section created a risk of physical harm to any person, to wit: did smash the windows of a vehicle owned by Shatoya Snow with a metal pipe while multiple persons were in close proximity.

(Jan. 8, 2018 Compl.)

{¶ 36} The complaint classified the offense being charged as a misdemeanor of the first degree.  As indicated previously, this degree of the offense includes the additional requirement that the act of criminal damaging or endangering create a risk of physical harm to any person.  In the present case, the property at issue was Shatoya's car.  Davenport concedes that the cell phone video confirms that she broke Shatoya's car window with the metal pole.  Indeed, Davenport's trial counsel admitted as much at trial.[5]  However,

---

[4] "The creation of a risk of physical harm to a person does not merely enhance the penalty.  Instead, it transforms the crime itself by increasing its degree.  In such a case, it is an essential element of the offense and must be proved by the state beyond a reasonable doubt." *State v. Hackett*, 11th Dist. No. 97-T-0232, (Mar. 26, 1999), citing *State v. Allen,* 29 Ohio St.3d 53, 54 (1987).

[5] At the close of the state's case-in-chief, Davenport's trial counsel moved for judgment of acquittal pursuant to Crim.R. 29 as to the assault offenses only.  Counsel averred that "[w]e've already admitted to Ms.

Davenport argues that she broke the passenger side window after Shatoya and Lisa had exited the vehicle and that her "actions in breaking the passenger window, when no one was in the car, created at best a remote possibility of physical harm to a person.  Exhibit 3 and the trial testimony show that no one was near the passenger side window when Ms. Davenport smashed it." (Davenport brief at 4.)  Davenport further concedes that the video depicts her striking the hood of Shatoya's vehicle with the metal pole.  However, she contends that "no one was close enough to that act for it to have created a risk of physical harm." (Davenport brief at 4.)

{¶ 37} We disagree with both of Davenport's contentions.  Although the video supports Davenport's assertion that Shatoya and Lisa had exited the vehicle, the video depicts Davenport walking near the open driver's side door while Jones and the unidentified woman in the red top had Shatoya pinned against it.  Moments later, the pole is seen coming down toward the driver's side of the car, and a loud noise is heard emanating from that area.  After Davenport strikes the driver's side of the vehicle, she walks around the back of the car toward the passenger side and strikes the hood of the vehicle, very close to the open driver's side door.  At this point, Shatoya is still pinned against the driver's side door.  The video corroborates Shatoya's testimony that she and others were "[a]ctually touching the vehicle" while the windows were being smashed and that she was "sitting on" the vehicle "when the pole came down." (Tr. at 169.)

{¶ 38} Davenport knew Shatoya and the others were on the driver's side of the vehicle when she struck the window.   As such, she would have known that there was a significant possibility that shattering glass may strike anyone in the vicinity.  A person using the level of force necessary to break the glass of a car window would likely understand that such action would create more than a remote possibility of physical harm to a person situated close to the car.  Davenport also knew that Shatoya and others were on the driver's side of the vehicle when she struck the hood.  As such, she would have known that there was a significant possibility that she could have inadvertently struck someone while smashing the hood. Accordingly, this record contains sufficient evidence that Davenport

---

Davenport striking the vehicle with the metal pole." (Tr. at 233.)  At the close of all the evidence, trial counsel again moved for a Crim.R. 29 judgment of acquittal as to the assault offenses only.  Counsel stated that "[a]s mentioned before, we admit to the criminal damaging count." (Tr. at 322.)

created a risk of physical harm to a person when she struck Shatoya's vehicle with the metal pole.

{¶ 39}  Further, we cannot find that the jury clearly lost its way in finding Davenport guilty of criminal damaging or endangering as a first-degree misdemeanor.  As previously discussed, Davenport concedes that she smashed Shatoya's car windows with the metal pole.  The cell phone video establishes that Davenport did so in close proximity to Shatoya and the other women with whom she was fighting.  Shatoya's testimony corroborates what is depicted in the video.  The jury viewed the video several times during the trial and heard the testimony and assessed the credibility of the witnesses who testified both for the state and for the defense.  There is competent and credible evidence to support the jury's verdict.  Accordingly, Davenport's conviction is not against the manifest weight of the evidence, and thus, it is also based on sufficient evidence.  *Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379 at ¶ 46.

{¶ 40}  Davenport's single assignment of error is thus overruled.

{¶ 41}  We now turn to Jones' appeal in case No. 18AP-395.  Jones appeals her conviction for assault in violation of R.C. 2903.13(A). She advances two assignments of error for this court's review:

> I.  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT GAVE A CONSCIOUSNESS OF GUILT INSTRUCTION TO THE JURY.
>
> II.  THE TRIAL COURT ERRED WHEN IT CONVICTED APPELLANT OF ASSAULT AS THE VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 42}  Under the first assignment of error, Jones contends the trial court abused its discretion by instructing the jury on flight as consciousness of guilt.  Jones maintains that the instruction was improper because the evidence establishes that she did not actively flee the scene to avoid apprehension; rather, she simply returned to her grandmother's apartment after the altercation dissipated, remained inside while the police knocked on the door, and waited for her grandmother to return home to let the police into the apartment.  She further maintains that she did not conceal herself inside the apartment in an attempt

to evade arrest; rather, she was sitting on the couch in the living room when the police entered.

{¶ 43} At issue is the following instruction provided by the trial court to the jury:

> Testimony has been admitted indicating that the defendants entered their residence and did not respond to police attempts to contact them until police were let into the residence by another person. You are instructed that this conduct alone does not raise a presumption of guilt but may tend to indicate the defendants' consciousness of guilt. If you find the facts do not support that the defendants entered their residence and did not respond to police attempts, or if you find that some other motive prompted the defendants' conduct, or if you are unable to decide what the defendants' motivation was, then you should not consider this evidence for any purpose. However, if you find the facts support that the defendants engaged in such conduct and if you decide that the defendants were motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendants are guilty of the crimes charged. You alone will determine [what] weight, if any, to give to this evidence.

(Tr. at 359-60.)

{¶ 44} "[A]n accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Internal quotations omitted.) *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 167. "Flight is more than merely leaving the scene of the crime – it would be unrealistic to expect persons who commit crimes to remain on the scene for ready apprehension." *State v. Ramos*, 8th Dist. No. 103596, 2016-Ohio-7685, ¶ 28, citing *State v. Santiago,* 8th Dist. No. 95516, 2011-Ohio-3058, ¶ 30. In this regard, " '[f]light means some escape or affirmative attempt to avoid apprehension.' " State *v. Robinson,* 10th Dist. No. 17AP-853, 2019-Ohio-558, ¶ 29, quoting *State v. Robinson*, 1st Dist. No. C-060434, 2007-Ohio-2388, ¶ 19. Flight requires an appreciation by the accused that he or she has been identified as a person of interest in a criminal offense and is taking active measures to avoid being found. *Ramos* at ¶ 28. The jury may infer that such circumstances demonstrate that the accused is avoiding the police only because he or she knows he or she is guilty and wishes to avoid the inevitable consequences of his or her crime. *Id.*

{¶ 45} A flight instruction is proper if the record contains sufficient evidence to demonstrate that an accused attempted to avoid apprehension. *Robinson,* 2019-Ohio-558, ¶ 29. Such an instruction " 'is treated as part of the overall jury instructions and is reviewed in the context of the entire jury instructions.' " *Id.,* quoting *State v. Anderson,* 7th Dist. No. 03 MA 252, 2006-Ohio-4618, ¶ 108. "An appellate court reviews a trial court's decision 'to give or not to give a particular jury instruction under an abuse of discretion standard.' " *Id.,* quoting *State v. Kaufman,* 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 103 (7th Dist.), citing *Sicklesmith v. Hoist,* 169 Ohio App.3d 470, 2006-Ohio-6137, ¶ 15 (7th Dist.). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Bass,* 10th Dist. No. 12AP-622, 2013-Ohio-4503, ¶ 25, citing *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219 (1983).

{¶ 46} As the state points out, Ohio courts have held that a consciousness of guilt instruction is proper where evidence establishes that an accused refused to comply with police commands to answer a door or exit a residence. For instance, in *State v. McCullough*, 3d Dist. No. 12-07-09, 2008-Ohio-3055, the court concluded that the trial court's instruction on consciousness of guilt was well-supported by the evidence where the accused "refused to answer the door to his residence even after the police announced their presence, boarded up the back door, concealed himself in a crawl space accessible through a trap door in a closet, and refused to come out until the police told him that they would bring in a canine unit." *Id.* at ¶ 41.

{¶ 47} In *State v. Taylor,* 7th Dist. No. 08 MA 122, 2010-Ohio-1551, the court held that a trial court's instruction on consciousness of guilt was supported by sufficient evidence when the accused did not comply with police commands to exit a residence, the police entered the residence with the owner's permission, and the accused ignored police commands to exit a closet. *Id.* at ¶ 5-6, ¶ 27.

{¶ 48} Similarly, in *State v. Lewis,* 4th Dist. No. 14CA3465, 2016-Ohio-1592, the court held that a consciousness of guilt instruction was warranted where the police observed the accused enter a house that was not his own, attempted to speak to the accused through the front door of the house and, after entering the house, discovered the accused in a crawl space. *Id.* at ¶ 27.

{¶ 49} Here, although Jones did not conceal herself in a crawl space or a closet as did the defendants in *McCullough, Taylor*, and *Lewis,* the testimony at trial provided a sufficient basis for the jury instruction on consciousness of guilt. The police attempted to make contact with Jones for over an hour after they became aware that she had left the scene of the altercation and gone to Mary Davenport's apartment. The police repeatedly knocked on the door of the apartment and announced their presence through use of a loudspeaker. Only after Mary Davenport arrived at her apartment and allowed the police to enter did Jones yield to police custody.

{¶ 50} The cases cited by Jones in support of her argument are inapposite. In *State v. Johnson,* 8th Dist. No. 99715, 2014-Ohio-2638, the court held that the trial court erred in giving the jury a flight instruction because the accused's leaving the scene of the crime was not deliberate flight in the sense of evading police detection. *Id.* at ¶ 110. The accused went to his residence, a location where he could normally be found, until he turned himself in after being advised that a warrant had been issued for his arrest. *Id.*

{¶ 51} Unlike *Johnson,* the jury instruction in the present case was not based on Jones leaving the crime scene. Rather, the instruction addressed Jones' failure to respond to numerous attempts by police to contact her while she was inside Mary Davenport's residence. As noted above, Jones ceded to the police only after Mary Davenport arrived one hour later and let the police inside her apartment.

{¶ 52} Similarly, in *Ramos*, 8th Dist. No. 103596, 2016-Ohio-7685, the court held that the trial court erred in giving the flight instruction because the evidence demonstrated only that the defendant left a crime scene, not that he was actively fleeing to avoid apprehension by law enforcement. Again, in the present case, the trial court did not instruct on consciousness of guilt based on Jones leaving the crime scene. Rather, the instruction focused on Jones' refusal to respond to police after she entered Mary Davenport's apartment.

{¶ 53} In *State v. Norwood*, 11th Dist. No. 96-L-089 (Sept. 30, 1997), the court held that a jury instruction stating that the accused "fled from the vicinity of the crime immediately following the alleged assault" was improper because the record contained no evidence that the accused left the general area in which he would normally be located. *Id.* Here, the trial court did not instruct the jury that Jones fled from the vicinity of the crime

immediately following the alleged assault. Moreover, the accused in *Norwood* did not remain inside a residence and ignore repeated attempts to contact him by knocking on the door and announcing their presence via loudspeaker. Finally, the accused in *Norwood* did not remain inside the residence for over one hour until the homeowner arrived and let the police inside.

{¶ 54} Furthermore, although the courts in *Johnson*, *Ramos*, and *Norwood* concluded that the consciousness of guilt instructions were improper, the defendants' convictions were ultimately affirmed. Applying a plain error review, the *Johnson* court found that the trial court's error did not affect the outcome of the trial. "The instruction, although improper, ultimately allowed the jury to determine the defendant's motivation in leaving the scene." *Id.* at ¶ 111. In *Ramos,* the court found that the error in providing the flight instruction was harmless beyond a reasonable doubt because the defendant would have been convicted even if the court did not give a flight instruction. *Id.* at ¶ 30. Similarly, in *Norwood,* the court found the instruction was harmless error due to the overwhelming evidence of the defendant's guilt.

{¶ 55} Furthermore, the instruction here provided that Jones' conduct in failing to respond to police attempts to contact her until Mary Davenport granted the police permission to enter the apartment did not create a presumption of guilt, only that her conduct may tend to indicate Jones' consciousness of guilt. The instruction also stated that if the jury found that some other motive prompted Jones' conduct, or could not decide what her motivation was, then the jury should not consider the evidence for any purpose. Finally, the instruction was neutral in its effect, providing that the jury may, but was not required to, consider evidence of Jones' conduct in deciding whether Jones was guilty of the crime charged. Indeed, in *State v. White,* 2d Dist. No. 26093, 2015-Ohio-3512, the court found an almost identical flight instruction "all but innocuous." *Id.* at ¶ 51. The court reasoned: "[The flight instruction] explains the limited use of the flight evidence and clearly says that the jury may consider [the defendant's] flight only if it finds that he was 'motivated by a consciousness or awareness of guilt.' And even if the jury finds that this motivated him, the instruction says that it still is not required to consider the flight evidence. We do not believe that giving the jury this particular instruction could have affected the outcome of the trial." *Id.*

{¶ 56} Finally, we need not consider Jones' argument that the consciousness of guilt instruction was improper because, pursuant to the Fourth Amendment to the U.S. Constitution, she was under no legal obligation to respond to police or leave her home without the police producing a warrant. Jones did not raise this argument in the trial court. "Well established in the law is the principle that a party cannot raise new issues or legal theories for the first time on appeal." *State v. Pilgrim,* 184 Ohio App.3d 675, 688, 2009-Ohio-5357, ¶ 19 (10th Dist.) Jones' failure to raise the issue in the trial court constitutes a waiver of that issue on appeal. *See* App.R. 12(A)(2) and 16(A)(7); *Pilgrim* at ¶ 20.

{¶ 57} In sum, the state provided sufficient evidence to warrant the consciousness of guilt instruction and the trial court provided a neutral instruction that the jury may consider whether Jones' conduct was motivated by a consciousness of guilt. Under the facts of this case, we find the trial court did not abuse its discretion in providing a consciousness of guilt instruction.

{¶ 58} Moreover, even if the trial court did abuse its discretion in giving the instruction, such error was harmless beyond any doubt. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Jones would have been convicted of assault despite the instruction due to overwhelming evidence of her guilt. The cell phone video clearly demonstrates that Jones committed assault by punching Lisa during the altercation.

{¶ 59} Jones' first assignment of error is overruled.

{¶ 60} In her second assignment of error, Jones maintains her conviction for assault is not supported by sufficient evidence and is against the manifest weight of the evidence. This assignment of error lacks merit.

{¶ 61} In our discussion of Davenport's assignment of error, we set forth the standards of review applicable to both sufficiency and manifest weight of the evidence claims. Accordingly, we need not reiterate them here.

{¶ 62} Jones was convicted of violating R.C. 2903.13(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to another." We have already set forth the definitions of "knowingly" and "physical harm to persons."

{¶ 63} Initially, we note that Jones wrongly asserts that she "was convicted on the theory that she stood behind another woman and punched Shatoya as she was pinned to

the vehicle." (Jones' brief at 17.) To the contrary, Jones was convicted of assaulting Lisa. Indeed, the verdict form denotes the offense for which the jury found Jones guilty as "2903.13(A) ASSAULT TOWARDS LISA SNOW."

{¶ 64} Jones does not challenge the state's evidence as it pertains to a specific element of the crime of assault. Rather, Jones' central argument concerns alleged inconsistencies in the testimony offered by Shatoya and Lisa. For instance, Jones complains that their trial testimony was inconsistent with the reports they made to the police the day of the altercation. Jones also argues that in their testimony related to the cell phone video, Shatoya and Lisa identified their assailants solely based on the clothes they wore that day, but admitted that they were unable to make out their faces from the video footage. Jones mischaracterizes the trial testimony in this regard. While it is true that Shatoya and Lisa identified Jones (and Davenport) by the clothing they wore, this manner of identification was at the state's request, ostensibly for the purpose of more easily describing the people involved in the incident to the jury. Moreover, during their narration of the video, both Shatoya and Lisa identified Jones (and Davenport) by name. Jones further complains that their identification of her in the video footage as the woman in the white top was inconsistent with Clark's testimony that the woman in the white top was too thin to be Jones.

{¶ 65} As to any perceived inconsistencies in the testimony of Shatoya and Lisa, the weight of the evidence and the credibility of the witnesses are determined by the trier of fact. *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79. None of these inconsistencies go to the manifest weight of the evidence, however, especially in light of the corroboration of the basic facts by the cell phone video of the incident. The jury was free to accept or reject any or all of the evidence offered by the parties and assess the witnesses' credibility. " '[W]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Protich,* 10th Dist. No. 15AP-758, 2016-Ohio-1326, ¶ 5, quoting *State v. Nivens,* 10th Dist. No. 95APA09-1236 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Buchar,* 5th Dist. No. 2017AP010003, 2017-Ohio-7601, ¶ 21, citing *State v. McGregor,* 5th Dist. No. 15-COA-023, 2016-Ohio-3082, ¶ 10. Our review of the

entire record shows no significant inconsistencies or other conflicts in the state's evidence that would demonstrate a lack of credibility of the state's witnesses. *Id.,* citing *State v. Sanders,* 5th Dist. No. 15-COA-33, 2016-Ohio-7204, ¶ 41.

{¶ 66} Moreover, our review of the video clearly demonstrates that the woman in the white top, identified at trial by both Shatoya and Lisa as Jones, punched Lisa during the altercation. Jones has not demonstrated that, due to inconsistencies in the evidence, "a miscarriage of justice" occurred or that the jury "lost its way" in finding her guilty of assault. This resolution is also dispositive of Jones' claim that her conviction is not supported by sufficient evidence. *Gravely,* 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 46.

{¶ 67} We thus overrule Jones' second assignment of error.

{¶ 68} Having overruled Davenport's single assignment of error and Jones' two assignments of error, we affirm the judgments of the Franklin County Municipal Court.

*Judgments affirmed.*

BRUNNER and McGRATH, JJ., concur.

McGRATH, J., retired, of the Tenth Appellate District,
assigned to active duty under authority of Ohio Constitution,
Article IV, Section 6(C).